Whitaker, Judge,
delivered the opinion of the court:
This action arises out of a contract dated December 15, 1941, between plaintiff and defendant whereby plaintiff agreed to manufacture and erect two 20-ton jib cranes at the Philadelphia Navy Yard, for a consideration of $265,000, which was later increased by two change orders to $278,192.13.
The controversy presented concerns the following four things:
(1) The extra cost to which plaintiff alleges it was put for completing parts of the cranes at the Philadelphia Navy Yard instead of at the. plant of its subcontractor in New York, as the result of defendant’s order to it to ship these parts of the cranes before they had been completed;
(2) Additions to or reductions in cost of performing the contract as a result of changes made;
(3) The cost of completing the contract by the defendant after it had terminated plaintiff’s right to proceed;
(4) The cost to defendant of correcting allegedly defective work, which defendant asserts as a counterclaim.
All of the questions presented, except the cost of correcting defective work, have been decided by the Chief of the Bureau of Yards and Docks, who was the contracting officer, and his decision has been affirmed by the head of the department. Defendant says that under article 15 of the standard *385 Government contract, as construed by the Supreme Court in United States v. Wunderlich, 342 U. S. 98, his decision is final and not subject to review, because of our finding that theré is no proof of conscious wrongdoing on the part of the contracting officer or of the head of the department or of an intention on their part to cheat or defraud plaintiff; and this, notwithstanding our finding that the contracting officer’s decision in many respects was arbitrary, capricious, grossly in error, and not supported by substantial evidence.
Since the case was tried and submitted, Congress passed Public Law 356,83d Congress, 2d Session, approved May 11, 1954 (68 Stat. 81), which reads as follows:
Be it enacted by the Senate and Rouse of Representatives of the United States of America in Congress assembled, That no provision of any contract entered into by the United States, relating to the finality or conclusiveness of any decision of the head of any department or agency or his duly authorized representative or board in a dispute involving a question arising under such.contract, shall be pleaded in any suit now filed or to be filed as limiting judicial review of any such decision to cases where fraud by such official or his said representative or board is alleged: Provided, however, That any such decision shall be final and conclusive unless the same is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence.
Sec. 2. No Government contract shall contain a provision making final on a question of law the decision of any administrative official, representative, or board.
The rule to be applied, therefore, is not that laid down by the Wunderlich decision, but that set out in the Act quoted, since it applies to “any suit now filed or to be filed.” That rule makes the decision of the head of the department final and conclusive, unless it is fraudulent or arbitrary or capricious or so grossly erroneous as to imply bad faith, or is not supported by substantial evidence.
. Prior to the Wwnderlich decision the rule laid down by the Supreme Court in quite a number of cases was that the decisions of the head of the department were not final where they were arbitrary, or capricious, or so grossly erroneous as to imply bad faith, or a failure to exercise an honest judg *386 ment. Burchell v. Marsh, 17 Howard, 344, 349; Kihlberg v. United States, 97 U. S. 398; United States v. Gleason, 175 U. S. 588; Ripley v. United States, 223 U. S. 695; Penner Installation Corp. v. United States, 116 C. Cls. 550, aff’d., per curiam by an equally divided court, 340 U. S. 898. See also Merrill-Ruckgaber v. United States, 241 U. S. 387 Plumley v. United States, 226 U. S. 545, and others. And in several cases this qourt has held that where a ruling was not supported by substantial evidence, it must be treated as-having been arbitrary, capricious, or so grossly erroneous as to imply bad faith, and, therefore, lacking in finality. In Needles v. United States, 101 C. Cls. 535, the court said,, at page 607:
* * * if the Court is satisfied that no reasonable man-could have determined the dispute upon all the relevant-facts and data as the administrative officer did, then the-court is justified in inferring, as a fact, that the decision was not made impartially or in good faith. If this-should not be the process contemplated by the rule that a decision may be set aside if “so grossly erroneous as-to imply bad faith,” it is difficult to see how the rule could ever be consistently and properly applied within, the realm of the probable intention of parties to a. contract.
See also Penner Installation Corp. v. United States, 116 C. Cls. 550, at page 564; Mitchell Canneries, Inc. v. United States, 111 C. Cls. 228, 247; Loftis v. United States, 110 C. Cls. 551, 630; Bein v. United States, 101 C. Cls 144 (concurring opinion).
Public Law 356, therefore, reinstated the rule applied in this court prior to the Wunderlich decision.
The case at bar was tried before the Wunderlich decision and under the rule applied in this court prior to the W wilder - lich decision, but it was-argued after that decision.
1. Cost of completing parts of the cranes at the Philadelphia Navy Yard. — The contract was awarded plaintiff on the day before the attack on Pearl Harbor, and was actually entered into on December 15, 1941. Defendant was, therefore, in urgent need of the cranes at the earliest possible date. Por a number of reasons plaintiff had been unable to complete the contract on time, and, hence, in an effort to expedite the *387 work, defendant ordered the trucks for the cranes and tlie hoist machinery and rotating mechanism, being manufactured at the plant of one of plaintiff’s subcontractors in New York City, to be shipped to the Philadelphia Navy Yard before completion, where the major portion of the cranes were being constructed. Plaintiff says that it cost it considerable additional sums to complete the construction of these portions of the cranes at the Philadelphia Navy Yard, instead of at the plant of the subcontractor in New York City.
Plaintiff’s claim therefor has been decided adversely to it by the contracting officer and the head of the department. But plaintiff says the contracting officer’s decision is not final because it was a breach of contract for the defendant to have ordered this shift in the situs for doing the work.
It is difficult for us to see how this constituted a breach of contract, but we do not need to decide this question, because it is impossible to determine from the proof the portion of the work which should have been done in the field and the portion which should have been done in the shop; nor is it possible to determine the excess cost of completing at the Philadelphia Navy Yard those portions which should have been completed at the plant of plaintiff’s subcontractor. There is, therefore, no reasonable basis to be found in the proof for the fixing of damages, even if this were a breach of contract. Addison Miller, Inc., et al. v. United States, 108 C. Cls. 513, 557, cert. den., 332 U. S. 836.
Plaintiff’s claim for these items is disallowed.
2. Adjustments in the contract price made by the contracting officer as a result of changes in the contract. — Article 27 of the General Provisions of the specifications related to “Adjustments in price and time owing to changes.” It provided for the appointment of a Board to determine the adjustments to be made on account of changes, two members of which should be representatives of the Government, and one member a representative of the plaintiff. The findings of this Board were subject to approval of the contracting officer, whose decision was made final, subject to appeal to the head of the department.
The majority of this Board recommended a reduction in the amount to be paid plaintiff as the result of savings ef *388 fected by changes, and for the cost of completing the contract after its termination, in the total amount of $43,994.00. Plaintiff’s representative submitted a minority report recommending an increase in the contract price of $67,271.82, instead of the reduction recommended by the majority. The contracting officer decided the contract price should be reduced by $34,120.00, subject to a credit of the sum of $4,993.20 for overtime plaintiff was required to pay its laborers at the demand of the Government, and on its promise to reimburse plaintiff therefor. The result of his determination was that the contract price should be reduced by the amount of $29,126.80. This was affirmed on appeal.
■ The contract price, as amended by change orders, amounted to $278,192.13. If this amount is to be reduced by the amount found by the contracting officer, $29,126.80, there would have been due plaintiff a balance of $249,065.33. Plaintiff has been paid $248,378.31, leaving a balance due, according to the contracting officer’s figures, of $687.02, which plaintiff is, confessedly, entitled to recover.
We are of the opinion, however, that the contracting officer’s decision on some of the items going to make up the total of $29,126.80 is not final, and is incorrect, for the reasons to be stated. These items follow. They will be given the same designation as they were given in the report of the Board on Changes.
Item (a). Additional l-imch cables. — The contracting officer proposed a reduction in plaintiff’s contract price of $407.00, for the purchase and installation of new main hoist cables 1 inch in diameter. Defendant concedes that this reduction in contract price was unwarranted. The facts show that plaintiff, over a .year after the acceptance of the cranes, furnished two reels of 1-inch cable for replacement of the main hoist cables on the two cranes, at a total cost of $825.61. Defendant also concedes that plaintiff is entitled to an increase in contract price in this amount for this item. Plaintiff, therefore, on this item may recover $1,232.61.'
Item (b). Gear reduction imits. — The specifications called for the installation of gear reduction units between the power plants and the parts to be operated thereby, in order to reduce speed and increase power. Upon inquiry plaintiff *389 learned that such units could not be delivered to it by the manufacturers thereof before 8 to 12 months. Plaintiff accordingly .suggested to the contracting officer that he authorize the substitution , of a spur gear reduction assembly as designed in its drawing M-ll, instead of the gear reduction units specified. This was authorized, and the substituted spur gear reduction assembly was installed.
The Board on Changes found that the contract price should be reduced by the amount of $3,267.00 on account of this substitution, which amount the contracting officer reduced to $2,970.00. On the other hand, the Commissioner of this court has found that instead of the reduction in contract price, there should have been an increase therein of the amount of $2,109.48 as a result of the substitution.
We have carefully considered the Commissioner’s finding and have adopted it, with a slight modification, as the finding of the court.
The gear reduction units called for by the specifications were precision made as complete and individually housed assemblies, designed to deliver the percentage of reductions specified to produce the required strength and load capacity. They were shop finished units, manufactured and assembled complete, and ready for installation. The installation of them would have been comparatively simple, since they required connections only at points of reception and output of power.
On the other hand, the open spur gear assembly had to be designed by plaintiff, and was designed by it in accordance with its drawing M-ll. This required designing the integral parts of the assembly and required field adjustments and alignments of it. The installation of such an assembly was, therefore, more expensive than the installation of a preassembled unit, which merely required connection at the intake and output of power.
Paragraph 27 of the general provisions of the specifications required that:
* * * In determining the change in price the cost of additions shall be the estimated actual cost to the contractor and the cost of deductions shall be the estimated cost to the contractor as of the time when the contract *390 was made. In arriving at the amount of the change, due allowance shall be made in the discretion of the contracting officer for overhead and general expense, plant charges, and other expense items of a similar nature. To all estimates of cost 10 percent shall be added for contractor’s profit. In determining the cost of changes, social security taxes (without overhead, bond or profit thereon) will be included as an item of the cost.
Thus the contracting officer was under the obligation of ascertaining the “estimated actual cost to the contractor” of the spur gear assembly, and of adding this cost to the contract price, and then deducting from the contract price “the estimated cost to the contractor as of the time when the contract was made” of the gear assembly units which were not installed.
The Board on Changes directed one Robert B. Burke, defendant’s estimator, to determine the amount to be added or deducted from the contract price on account of the substitution of the spur gear assemblies for the gear reduction units. This man asked the Falk Corporation what the gear reduction units, which were discarded, would cost. This corporation advised him they would cost $6,480. He then asked a mechanical engineer for another corporation, the Dry Docks Associates, what it would cost plaintiff to install the spur gear assembly. This man told him that it should cost $3,800 for the two cranes. Burke took the difference between $6,480 and $3,800 as a saving to the plaintiff. To this deduction he added a 10 percent saving in overhead expense, 10 percent for profit, and 0.75 percent as the reduction in bond premium, and came up with the figure of $3,267, which he said the plaintiff would save by reason of the substitution. The Board adopted this, and also the contracting officer and the head of the department, after eliminating the profit.
It is obvious that the figures furnished Burke by these two corporations were merely guesses. Burke had no plan for the gear reduction unit which was discarded, and prepared none for the Falk. Corporation in order that they could make an intelligent estimate; nor was drawing M-ll, which had been prepared by plaintiff for the spur gear assembly, furnished to the Dry Docks Associates, nor any other specifica *391 tions therefor; nor did Burke advise these people of the size or nature of the materials to be used in the spur gear assembly, nor the sizes or nature of the materials used in the gear reduction unit for which the ■ spur gear assembly was substituted.
In short, neither one-of these corporations was furnished the information necessary for them to make an intelligent estimate. The figures they furnished plaintiff were no more than rough guesses. It is indeed surprising that they would be willing to make any estimate, considering the paucity of information upon which to base it.
Whereas this estimator found that the plaintiff would save $3,261 on account of this substitution, the Commissioner of this court has found that it would cost plaintiff an additional amount of $2,109.48 to make the substitution.
We think the finding of the contracting officer, affirmed on appeal by the head of the department, on this item was no more supported by substantial evidence than the offhand guess of an architect as to what it is going to cost to build a home. Not only do we think his decision on this item is not supported by substantial evidence, we think it closely approaches being capricious, and so grossly erroneous as to show recklessness, if not to imply bad faith.
Item (c). Conical rollers. — Here, too, we think the decision of the contracting officer is not supported by substantial evidence.
The specifications provided that the revolving section of the crane consisting of the machinery house, boom, and other operating equipment would be mounted upon a frame which could be rotated in a complete circle. The means provided for by the specifications for rotating this upper section consisted of upper and lower heavy steel circular castings or rails with surfaces machined to a conical shape, known as the roller path. Conical rollers were to be provided between the upper and lower rails as bearings upon which the upper section could be rotated in a circular motion. The rollers were to be held in place by a rigid cage having radial members centered around the kingpin, similar to spokes in a wheel, known as the spider. The roller path formed a complete circle approximately 25 feet in diameter.
*392 It required a very large mill to machine the surfaces of the roller path to a conical shape to fit the conical roller bearings. It developed that such a milling machine was not available to do this. Whereupon, defendant’s chief designer, a Mr. Wagstaff, suggested a change in the rotating mechanism from roller bearings and roller path to 175-pound rails and wheels with toughened rims and flanges tp fit between the rails.
Accordingly, plaintiff submitted drawings M-13 and M-14for the roller cage assembly and rotating mechanism, showing designs for 175-pound Lorain circular rails 25 feet in diameter, similar to the size used for railroad tracks, and 36 flanged wheels 14 inches high to carry the revolving superstructures. As revised, the drawings called for wheels to be flanged on opposite sides of the rails on alternate wheels. The rails were bolted to the upper revolving frame and the lower stationary frame upon a %-inch steel plate, with bolts 1 inch in diameter. This mechanism was substituted for the conical roller mechanism.
The Board on Changes adopted the report of defendant’s chief estimator, in which he found that the contract price should be reduced by the amount of $11,215 on account of the substitution of these rails and wheels for the conical rollers and roller path originally .specified. The contracting officer eliminated, the 10 percent profit reduction included in the report of the Board on Changes, but found that the Government was entitled to a credit of $10,196 on account of this substitution.
As in the case of the gear reduction units, the Board on Changes and the contracting officer and head of the department relied upon the report of the defendant’s chief estimator Robert B. Burke. This man, however, had no knowledge of plaintiff’s actual cost for the rotating mechanism actually installed in the cranes. He made no calculations of comparative cost between the conical rollers and roller path and the rails and wheels actually installed, and did not even know that the rims and flanges of the wheels were toughened steel. This estimator got estimates from the Dravo Corporation, and again from Mr. Keene, the mechanical engineer of Dry Docks Associates. Mr. Keene estimated that the conical rollers and roller path would have cost plaintiff $2,830 *393 per crane, and that the flanged wheels and rails would have cost it $1,290, or a saving of $1,540 per crane. The Dravo Corporation, on the other hand, estimated plaintiff would save the sum of $6,000 per crane by the use of flanged wheels and rails. Burke took these figures and arrived at what he calls a “weighted average” of $4,600 on each crane, or a total saving of $9,200. To this sum he added 10 percent for overhead, and 10 percent for profit, and 0.75 percent for bond premium, making a total of $11,215.49, which the contracting officer reduced to $10,196.
Here again, neither the Dravo Corporation nor the Dry Docks Associates was furnished the original plan for the •conical rollers and roller path, nor were they furnished •drawings M-13 and M-14 designed by the plaintiff for the ■flanged wheels and rails. No details were given them of weights of the materials to be used or the prices of material.
The Commissioner of this court has found that it actually cost plaintiff $3,844.46 more to install these rails and wheels than it would have cost it to have installed the conical rollers :and roller path. We think the Commissioner’s finding is justified and we have adopted it as a finding of the court. Therefore, instead of the defendant being entitled to a reduction in the contract price of $10,196, we think plaintiff is entitled to an addition to it in the amount of $3,844.46.
Here again we think the contracting officer’s finding was nothing more than a rough guess and was not supported by substantial evidence, and that it approaches being capricious .and grossly erroneous.
Item (d). Cost of completion after termination. — This will be dealt with later after further consideration of the adjustments made on account of changes.
Item (e). Cost of installing bronze bushings, $1,773.00.— At the hearing the defendant conceded that the plaintiff •should not have been charged with this item and that it is •entitled to recover it.
Item (f). Ratchet locking devices. — The contracting officer required the installation of mechanical ratchet locking •devices on the boom hoists of both cranes, claiming that they were required by the specifications. Plaintiff insists they were not so required. A decision involving a construction *394 of tbe specifications is not binding on us because not a finding of fact, tbe disputes clause, according finality to the findings of the contracting officer, being limited to findings of fact. Farwell, Inc., v. United States, 126 C. Cls. 317.
Tbe provisions of tbe specifications relied upon by the contracting officer as requiring a ratchet locking device read as follows:
2-05.3 (b) Luffing mechanisms shall be arranged so that the position of the jibs can change only when the mechanism is in operation. The mechanisms shall be capable of luffing the loaded jobs [jibs] between the specified radii in the time specified and shall each consist of a motor, flexible coupling, reduction gear unit, drum gear and pinion, drum, automatic electric brake, and mechanioal brake, all mounted on a common bedplate. The jibs shall be capable of being lowered to a horizontal position.
2-09. Mechanical brakes, locking devices, radius indicator, and fire extinguisher. — Mechanical brakes of the hydraulically operated type shall be provided for the hoisting and luffing mechanisms. * * *
The contracting officer did not furnish bidders detailed drawings when inviting bids. Instead, the successful bidder was required to submit his own drawings for approval. After the contract was let to plaintiff, it submitted its drawing M-ll, which provided for a hydraulically operated brake on the hoist and luffing mechanisms, and for an automatic electric brake on the shaft of the motor. The jib was under control of the motor at all times while in operation and could be lowered to the ground. The brake could not be disengaged except electrically. No ratchet locking device was provided on the plan nor installed by the plaintiff. This drawing was approved by the contracting officer on July 4, 1942.
Since drawing M-ll was one made pursuant to the above-quoted articles of the specifications, and since it provided for no ratchet locking device, and since it was approved by the contracting officer, it cannot be said that a ratchet locking device was called for by the specifications. A reading of the specifications certainly does not indicate that it is called for.
Furthermore, the Government representatives never mentioned a ratchet locking device until February 15,1943, some *395 15 months after work on the cranes had been started and 10 days before plaintiff’s right to proceed was terminated.
There was no justification for reducing the contract price by this item, and plaintiff is entitled to recover the sum of $1,718.00 on account of this item.
Item (g). Swivel hooks. — Plaintiff’s drawing No. 8 provided for a plain, single prong hook on the main hoist of both cranes. This drawing was submitted for approval by plaintiff on January 20, 1942, and was finally approved on January 11, 1943. Prior to approval and prior to installation plaintiff wrote defendant on May 8,1942, as follows:
We are ordering two 30-ton capacity hooks to be attached to the blocks of the main hoist and two 10-ton hooks for the auxiliary hoist, for the two 20-ton whirler cranes for Philadelphia.
We understand our contract calls for plain hooks. Please advise promptly if we are correct in this.
The Chief of the Bureau of Yards and Docks replied on May 13,1942, as follows:
In reply to your letter, reference (a), the Bureau advises that single-barbed hooks will be required for the blocks of the main and auxiliary hoists for the subject cranes.
There was, therefore, no justification for charging plaintiff for the installation of the dual pronged swivel hooks in lieu of the plain single pronged hook which had been previously installed.
Plaintiff is, therefore, entitled to recover the sum of $1,607.00, by which amount its contract price was reduced to cover the cost of the installation of these dual pronged swivel hooks.
Item (h). Lubrite thrust washers. — Plaintiff in its drawing M-13 had provided for plain bronze washers at the hubs of the roller cage wheels and for lubrication of them, which was approved by the defendant. Later, the defendant decided to experiment with lubrite bearings. The theory of lubrite lubrication is that the antifriction powder of the lubrite bearings would be deposited upon the pins on which the wheels turned and would be carried out to the side or hub area for adequate lubrication of the thrust washers. Lubrite *396 washers were not specified or required in the change from plain bronze bushings to lubrite bushings, nor did the defendant ever install lubrite washers. The reduction in the contract price of $1,277.00 is a mere estimate of what it would have cost the defendant to have installed these lubrite washers had it decided to do so. There is no justification whatever for reducing the contract price by this amount, and plaintiff is entitled to recover $1,277.00, by which amount the contract price was reduced on account of this item.
Item (i). Guards and traoJe brushes. — It is conceded that this item was called for by the specifications and was not installed by plaintiff. It was, therefore, proper to reduce the contract price by the cost of the installation of them, which was found by the contracting officer to be $743.00.
Item (j). Searchlight handles. — The plaintiff’s contract price was reduced by the sum of $33.00 for the installation of an extension to the searchlight handle on both cranes. The specifications do not designate the length of the handle required on the flood lights. The plaintiff provided 3-foot handles. On demand of the contracting officer for an extension of the length of these handles, plaintiff purchased 6-foot handles and shipped them to the defendant, with the request that the old 3-foot handles be returned to it. There is no evidence that the new handles were installed or that the old handles were ever returned.
Since plaintiff furnished the handles demanded, there seems to be no justification for this reduction in the contract price.
Item (k). Replace broken gauge. — The only thing broken about this gauge was the glass cover. This was broken after defendant had terminated plaintiff’s right to proceed and while another contractor was completing the contract. No justification for charging plaintiff with the cost of replacing this glass cover appears, and plaintiff is entitled to recover $19.00 on account of this item.
Items (1) and (m). — The Board on Changes proposed to reduce the amount payable to the plaintiff by the amount of these items, but it was reversed by the contracting officer, and the contract price was not reduced by the amount of them.
*397 : Item (n). Guards over main hook sheaves. — These guards were called for by the specifications and were not installed by plaintiff and, therefore, the contract price should have been reduced by the cost of installing them, found by the contracting officer to be $55.00.
3. Cost of completion. — As heretofore stated, the date for the completion of this contract was June 3,1942. Much delay was encountered, however, due to the difficulty of obtaining materials and other things, so that on February 25, 1943, the work was still incomplete. On that date the defendant terminated plaintiff’s right to proceed and entered into a contract with three firms, operating as Dry Docks Associates, to complete the work. The work was completed by them at a cost of $14,718.38, paid to Dry Docks Associates, and at an additional cost to the Government of $1,690.00 for the use of Navy Yard cranes in completing the work.
The contract was terminated “for the convenience of the Government.” Defendant does not seek to charge plaintiff with any excess cost, but it does assert the right to deduct from plaintiff’s contract price what it cost the Government to complete the work. This cost is alleged to have been $13,322.00.
The Government, of course, is entitled to deduct from the contract price whatever it cost it to complete the work. Plaintiff does not dispute this, but does claim that a number of the items included in the Government’s statement of the •cost of completion were improper items.
Here again the Government asserts the finality of the decision of the contracting officer, affirmed on appeal. What was the actual cost of completion is of course a question of fact, and the contracting officer has determined that fact by finding that the cost was $13,322.00. While we think some of the items are questionable, and that the amounts of them have been arrived at in a very casual sort of way, we find from our review of the facts that it actually did cost the defendant as much as, or more than, $13,322.00 to complete the contract work.
The defendant was, therefore, justified in reducing the contract price by this amount. This amount, by the way, *398 goes to make up the total of $29,126.80, by which, the contracting officer reduced the contract price.
The full facts relative to the cost for completion of the work is set forth in our findings 48 to 57, both inclusive.
To summarize, the contracting officer made unauthorized reductions in the contract price of the following amounts, which plaintiff is entitled to recover.
(1) $687.02, amount due plaintiff, even conceding the correctness of the total reduction in the contract price of $29,-126.80 made by the contracting officer;
(2) $2,970 on account of the substitution of the spur gear assembly for the gear reduction units;
(3) $10,196 on account of the substitution of rails and wheels for the conical rollers and roller path;
(4) $1,232.61 on account of the additional 1-inch cables, which was withdrawn at the trial;
(5) $1,773.00, the cost of installing bronze bushings in the jib hinge pins, which was conceded by the defendant at the trial;
(6) $1,718.00, deduction for ratchet locking devices;
(7) $1,607.00, deduction for dual pronged swivel hooks;
(8) $1,277.00, deduction for lubrite washers;
(9) $33.00, deduction for extension to handles for flood lights;
(10) $19.00, deduction to replace a broken glass on a gauge.
Thus the contracting officer erroneously reduced the contract price by the sum of $21,512.63, which amount plaintiff is entitled to recover, and plaintiff is also entitled to recover the excess cost of the substitution of the spur gear assembly for the gear reduction unit in the amount of $2,109.48, and for the substitution of the steel rails and wheels for the conical rollers and roller path in the amount of $3,844.46, or a total of $5,953.94.
Plaintiff is, therefore, entitled to recover the total sum of $27,466.57.
4. Cownterclaim — Cost to defendant of correcting allegedly defective work. — Defendant’s counterclaim for the cost of correcting allegedly defective work is without merit. The petition was filed on June 18, 1947. Testimony was taken during 1949 to 1951. It was not until July 1950 that the de *399 fendant filed its counterclaim, more than three years after the petition was filed. This counterclaim was amended in December 1950.
No defect in the operation of the cranes had been asserted prior to the filing of a counterclaim, except a request from the assistant public works officer, for plaintiff to remit the sum of $485.00 to cover some little items due principally to the failure of the lubrite bearings which had been substituted by the defendant for the bearings called for by the original contract. No other defect in the operation of the cranes was ever asserted until the filing of the counterclaim. It is plainly an afterthought, which we do not think merits detailed discussion in this opinion. The facts, however, are set out in findings 68 to 80, both inclusive.
On the whole case, plaintiff is entitled to recover from the defendant the sum of $27,466.57 for which judgment will be entered.
Madden, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
Judge Laramore took no part in the consideration or decision of this case.
FINDINGS OP PACT
The court having considered the evidence, the report of Commissioner Currell Yance, and the briefs and argument of counsel, makes findings of fact as follows:
1. Wagner Whirler and Derrick Corporation, hereinafter referred to as the plaintiff, is and was at all times hereinafter mentioned, a corporation organized and existing under and by virtue of the laws of the State of New York, with its principal office and place of business in New York City.
2. The plaintiff claims the sum of $123,485.07 upon its performance of a certain contract with the Bureau of Yards and Docks of the Navy Department for the construction of two 20-ton jib cranes, and as a result of alleged breach of the said contract on the part of the defendant’s officials.
3. On or about October 21,1941, the plaintiff submitted its bid of $265,000 for the manufacture and erection of two 20-ton jib cranes for the United States Navy Department at the Philadelphia Navy Yard. The bids were opened Oc *400 tober 22, 1941, at the Bureau of Yards and Docks, Navy Department, Washington, D. C., and the plaintiff was advised of the acceptance of its bid by letter of December 6, 1941.
4. Prior to submitting this bid, George P. Wagner was the president and sole stockholder in the plaintiff corporation, and was experienced in the design and construction of the type of cranes involved herein.
The plaintiff was financially unable to perform the work at the time its bid was submitted, but an agreement had been entered into between George P. Wagner, Charles Goodman and others whereby the Wagner Company, a limited partnership, would be formed to finance and carry out the work.
By a resolution of the plaintiff’s board of directors and stockholders October 22, 1941, George P. Wagner was empowered and directed to subcontract in full to the Wagner Company any and all contracts entered into by the plaintiff for the design, manufacture and erection of the type of cranes involved herein; and said resolution further provided that all other subcontracts entered into by the plaintiff would be approved by and be deemed subcontracts of the partnership, and that all payments to the plaintiff on such contract or contracts would be turned over to the Wagner Company.
5. Following the receipt by the plaintiff of the notice of award, and in pursuance of the aforesaid agreement, articles of partnership of the Wagner Company were entered into December 9, 1941, by the following named, showing their respective interests:

General partners Interests

'George P. Wagner_ 25%
'Charles Goodman_ 20%
Robert Goodman_ 15%

Special partners

Jeanette Wagner_ 20%
Sylvia Goodman_ 10%
Doris Goodman Jaeoby_ 10%
6.No written subcontract was entered into between the plaintiff and the Wagner Company, but the general partners Charles and Robert Goodman were both made vice presidents in the plaintiff corporation. A resolution of the plain *401 tiff’s board of directors of December 23, 1941, authorized each of its officers to endorse and transfer to the Wagner Company checks, drafts and other receipts on account of its contracts, and stated that the Wagner Company would perform the work.
The Wagner Company did perform all the work, received all payments and maintained records of costs and related matters in the performance of the contract in suit. All the general partners were actively engaged in the performance of the contract herein.
Since each of the general partners was also an official in the plaintiff corporation, and acted as such official in all correspondence with the defendant, and in .other respects, their activities will be referred to hereinafter as those of the plaintiff.
7. Contract NOy 5193, dated December 15, 1941, was entered into between the plaintiff and B. Moreell, Chief of the Bureau of Yards and Docks, as contracting officer for the United States; The contract provided for the manufacture and erection of two 20-ton revolving hinged jib cranes on ■traveling gantry bases at the United States Navy Yard at Philadelphia; in' strict accordance with specification No, 10499, dated September 22,1941, and addendum 1, dated October 7,1941, and the drawing mentioned therein. The price .was $265,000.
It also provided that work was to commence within one calendar day after the date of the receipt of notice to proceed by the plaintiff and to be completed within 155 calendar days from such date. This contract provided in part as follows: , . .
Article 3. Changes. — The contracting officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. No change involving an estimated increase or decrease of more than Five Hundred Dollars shall be ordered unless approved in writing by the head of the department or his duly authorized representative. *402 Any claim for adjustment under this article must be asserted within 10 days from the date the change is ordered : Provided, however, That the contracting officer, if he determines that the facts justify such action, may receive and consider, and with the approval of the head of the department or his duly authorized representative, adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in article 15 hereof. But nothing provided in this article shall excuse the contractor from proceeding with the prosecution of the work so changed.
Article 4. Changed conditions. — Should the contractor encounter, or the Government discover, during the progress of the work subsurface and/or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications, the attention of the contracting officer shall be called immediately to such conditions before they are disturbed. The contracting officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ the contract shall, with the written approval of the head of the department or his duly authorized representative, be modified to provide for any increase or decrease of cost and/or difference in time resulting from such conditions.
Article 5. Extras. — Except as otherwise herein provided, no charge for any extra work or material will be allowed unless the same has been ordered in writing by the contracting officer and the price stated in such order.
Article 6. Inspection. — (a) All material and workmanship (if not otherwise designated by the specifications) shall be subject to inspection, examination, and test by Government inspectors at any and all times during manufacture and/or construction and at any and all places where such manufacture and/or construction are carried on. The Government shall have the right to reject defective material and workmanship or require its correction. Dejected workmanship shall be satisfactorily corrected and rejected material shall be satisfactorily replaced with proper material without charge therefor, and the contractor shall promptly segregate, and remove the same from the premises. If the contractor fails to proceed at once with the replacement of rejected mate *403 rial and/or the correction of defective workmanship the Government may, by contract or otherwise, replace such material and/or correct such workmanship and charge the cost thereof to the contractor, or may terminate the right of the contractor to proceed as provided in article 9 of this contract, the contractor and surety being liable for any damage to the same extent as provided in said article 9 for terminations thereunder. * * *
Article 9. Delays-Damages. — If the contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in article 1, or any extension thereof, or fails to complete said work within such time, the Government may, by written notice to the contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. In such event the Government may take over the work and prosecute the same to completion, by contract or otherwise, and the contractor and his sureties shall be liable to the Government for any excess cost occasioned the Government thereby. If the contractor’s right to proceed is so terminated, the Government may take possession of and utilize in completing the work such materials, appliances, and plant as may be on the site of the work and necessary therefor. If the Government does not terminate the right of the contractor to proceed, the contractor shall continue the work, in which event the actual damages for the delay will be impossible to determine and in lieu thereof the contractor shall pay to the Government as fixed, agreed, and liquidated damages for each calendar day of delay until the work is completed or accepted the amount as set forth in the specifications or accompanying papers and the contractor and his sureties shall be liable for the amount thereof: Provided, That the right of the contractor to proceed shall not be terminated or the contractor charged with liquidated damages because of any delays in the completion of the work due to unforeseeable causes beyond the control and without the fault or negligence of the contractor, including, but not restricted to, acts of God, or of the public enemy, acts of the Government, acts or another contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unsually severe weather or delays of subcontractors due to such causes, if the contractor shall within 10 days from the beginning of any such delay (unless the contracting officer, with the approval of the head of the department or his duly authorized representative, shall grant a further *404 period of time prior to the date' of final settlement of the contract) notify the contracting officer in writing of the causes of delay, who shall ascertain the facts and the extent of the delay and extend the time for completing the work when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal, within 30 days, by the contractor to the head of the department concerned or his duly authorized representative, whose decision on such appeal as to the facts of delay and the extension of time for completing the work shall be final and conclusive on the parties hereto.
Article 15. Disputes. — Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the contracting officer subject to written appeal by the contractor within 30 days to the head of the department concerned or his duly authorized representative, whose decision shall be final and conclusive upon the parties thereto. In the meantime the contractor shall diligently proceed with the work as directed.
. 8. The general provisions of the specifications provided in part:
27. Adjustments in price and, time owing to changes.— In case of changes as contemplated by article 3 of the contract, the cost thereof, and any change in the time for performance involved shall be estimated by the officer in charge and reported by him to the Chief of the Bureau of Yards and Docks. If his estimate of cost exceeds $500, estimates of cost and time shall be made by a. board appointed by or under the direction of the Chief of the Bureau of Yards and Docks, consisting of two officers or other representatives of the Government and one representative nominated by the contractor, which estimates shall be reported to the chief of said bureau. The Chief of the Bureau of Yards and Docks as contracting officer, shall in all cases determine the change, if any, in price and time involved, subject to the right of appeal provided for in article 15 of the contract. In determining the change in price the cost of additions shall be the estimated actual cost to the contractor and the cost of deductions shall be the estimated cost to the contractor as of the time when the contract was made. In arriving at the amount of the change, due allowance shall be made in the discretion of the contracting officer for overhead and general expense, plant *405 charges, and other expense items of a similar, nature. To all estimates of cost 10 percent shall be added for contractor’s profit. In determining the cost of changes,' social security taxes (without overhead, bond or profit' thereon) will be included as an item of the cost.
29. Procedure after termination of right of contractor to proceed. — When the right of the contractor to proceed is terminated as provided in article 9 of the contract, a board of officers or other representatives of the Government shall be appointed, which shall estimate; the value of all materials delivered and work done, including a fair profit, and submit its estimate to the Chief of the Bureau of Yards and Docks who shall determine the value. The Government may proceed to complete the work according to the contract, with such changes as may subsequently be found necessary or desirable, in such manner and by such means as it may deem advisable, and may, if the interests of the Government demand it, use or employ any material, tools, machinery, appliances, and accessories belonging to or' furnished by the contractor for use in connection with the work covered by the contract. Said Board shall also inventory and estimate the value of said materials, tools, machinery, appliances, and accessories, and said inventory and estimate shall, if approved by the Chief of the Bureau of Yards and Docks, be conclusive in any accounting between the parties to the contract, subject to the right of appeal provided for in article 15 of the contract : Provided, That the Government shall not be liable for depreciation by ordinary wear and tear, or injury or destruction by superior force, or for such materials or articles as are consumed in use. Upon the completion of the work the cost of completing it shall be ascertained and determined, and when approved by the Chief of the Bureau of Yards and Docks shall be conclusive upon all parties, subject to the right of appeal provided for in article 15 of the contract. Should the total of the payments made to the contractor plus the cost of completing' the work exceed the contract price, modified by the cost, of any changes made before or after the termination of the right of the contractor to proceed, the difference shall be charged to the contractor, who promises to pay it upon demand. Should the total cost of the work be less than the contract price, the contractor shall be credited with the difference between the contract price, as modified by changes, and the total cost of the work, provided the amount so credited shall not exceed the value of the .materials delivered and work done by'.the contractor,, less previous payments to him. • '
*406 The plaintiff orally declined to guarantee completion of the work within the contract period, because of war conditions. No amount was specified for liquidated damages as a result of delays stipulated in article 9 of the contract.
Only one contract drawing was indicated to accompany the specifications. Paragraph 1-10 of the specifications required that the plaintiff submit for approval eight drawings arid calculations before commencing the fabrication of any of the work. It also provided in part:
The usual procedure of requiring the submitting for approval of detail drawings will be waived. In general, detail factory inspection will also be waived and the cranes will be accepted on the basis of satisfactory surface inspection, and operating with load tests.
9. The specifications also provided that, upon a request of the successful bidder, the Bureau of Yards and Docks would obtain a preference rating certificate assigning an A-l-a rating to the contract for all items listed in the “Priorities Critical List” of the Army and Navy Munitions Board, dated August 11,1941. A certificate assigning a preference rating of A-l-a, Code 3, was furnished the plaintiff December 9,1941.
Because of delays hereinafter referred to, the plaintiff’s contract was assigned a new preference rating of AA-3 on July 15,1942, and on August 4,1942, it was rerated as AA-1 for all orders on which delivery had not been completed and upon all new orders which might be necessary. These were the only priority ratings issued on this contract.
In order to obtain the replacement of one of the main hoist cables that had been damaged during erection and rejected, the public works officer on February 2, 1943, initiated steps to obtain an AAA priority for this cable, but the replacement was obtained without delay.
10. Notice to proceed with the contract was issued by the defendant December 29, and received by the plaintiff on December 30,1941, thereby establishing the completion date as June 3,1942.
On January 8, 1942, the plaintiff submitted its planned progress schedule which indicated that all major parts would be completed about May 5, 1942, and that the erection and *407 electrical installations would start about May 1, and be completed by June 3,1942.
11. The specifications provided tbat tbe Government, through its officers, would at all times exercise full supervision and general direction of all work under the contract so far as it affected the interests of the Government.
During the early period of the plaintiff’s contract, Capt. Gaylord Church was the Public Works Officer, in charge of all work at the Philadelphia Navy Yard. He was followed by Capt. H. E. Lacey, who continued during most of the performance period. The Public Works Officer was assisted by Lt. Comdr. Wilmer Kline, who was in charge of all contract construction work in this district. He was assisted by various project managers in charge of particular contracts.
Lt. E. W. Hutchinson was project manager on the plaintiff’s contract during most of the performance period, and was followed by Lt. W. A. Black. The project manager was. assisted by a civilian engineer, J. C. Moxey, to expedite the work. An inspector was assigned to the plaintiff’s contract at the Philadelphia Navy Yard and made daily reports of progress to the Public Works Officer.
The Navy Department’s supervising engineer’s office in New York City assisted in connection with the procurement of materials, through Lieutenant Glaze of that office.
John P. Wagstaff was in charge of the designing of weight handling and transportation equipment in the design division of the Bureau of Yards and Docks. The plaintiff’s construction drawings were discussed with him and required the approval of that office.
12. The whirler crane specified in the plaintiff’s contract was capable of revolving the full 360 degrees of a circle. It was mounted upon four trucks, with four wheel to each truck, designed to travel on two sets of standard gauge railroad tracks approximately 25 feet apart on centers. The wheels were 33 inches in diameter, 5 feet 8 inches between axle centers, and the over-all width of the truck axles and wheels was 6 feet 5% inches.
The trucks carried a gantry or stationary platform supported by four structural steel legs and braces approxi *408 mately 15 feet 9 inches in height and connected with the truck by a bearing 20 inches in diameter. The height of the gantry was approximately 26% feet above the rails.
The revolving superstructure consisted of a machinery house and other operating equipment, and was mounted on top of the gantry platform to an over-all height of approximately 73 feet.
The specifications provided for conical rollers installed between the upper and lower rails of a conical roller path upon which the superstructure would rotate in a complete circle as in a roller bearing. The circular roller path was 25 feet in diameter and the roller cage was held in position by steel members connected in the center'around the kingpin for equal radii of approximately 12% feet. These horizontal connections of the roller cage were similar to the spokes of a wheel and were sometimes referred to as the “spider.”
The conical rollers and roller path were later eliminated because of the unavoidable delay in obtaining the services of a mill capable of grinding the roller paths of the size required. In lieu thereof, and upon approval of the defendant, the plaintiff provided 175-pound circular rails of approximately 12%. feet radii,, between which were installed 36 wheels for rotating the superstructure. These wheels were 14 inches in diameter, 4% inches wide with 1%-inch flanges on each wheel overhanging opposite sides of the rail by alternate wheels, and with toughened steel rims and flanges. The wheels and roller cage assembly are sometimes referred to as the roller race.
The machinery house was constructed upon the travel base turntable and was specified for sufficient size to accommodate, without crowding, the concrete counterweight of approximately 22 cubic yards, the Diesel generating unit and fuel tank, operating machinery, and other equipment necessary for the operation and control of the crane.
The íength of the boom was approximately 131 feet. The luffing radius of the main hoist was from 115 feet to 60 feet. The maximum height of the lift of the main hoist hook was to be 90 feet above the rails at the maximum radius of 115 feet and. the lowest point at 48 feet, below the rails at any *409 radius. The main hoist hook of' the crane was required to handle a working load of 20 tons (of 2,240 pounds)' at a maximum radius of 115 feet; and the auxiliary hoist hook was to handle a working load of 5 tons at a maximum radius of 121 feet.
The total weight of the crane was 590,500 pounds, which, with the maximum load weight of 44,800, makes the loaded weight of 635,300 pounds. The weight of the superstructure on the turntable was 280,900 pounds, plus the concrete counterweight of 87,100 pounds. A full load on the tackle of 44,800, makes the total weight of the revolving section 412,800 pounds. When loaded approximately 90 percent of the weight was carried in front of the center pin and rode on. one-third, or 12 of the 36 wheels of the roller race.
The weight of the crane was carried by the four trucks,, which were connected to the portal legs with a gudgeon pin on each truck. A heavy forging about 20 inches in diameter, referred to as a gudgeon post, housed the gudgeon pin. It was a “lubrite” bearing and was supposed to slide back and forth on the pin to compensate for the motions of the crane in negotiating curves or traveling over irregular tracks. The average weight on any one truck varied greatly by the thrust of the weight in starting or stopping, and would be practically twice the average weight as the revolving load was over any one corner.
The crane was electrically operated and lighted by its own power plant'. A Diesel generating engine of 200-kw. capacity of continuous duty was specified to provide the current. Four operating motors and four traveling motors were specified; one for the main hoist of 100 hp., one for'the auxiliary hoist of 65 hp., one for the luffing hoist of 65 hp., one for the rotating machinery of 33 hp., and one motor of 33 hp. for each of the four trucks for moving the crane forward or backward upon the rails.

Mechanical Drcmings and Calculations

13. The specification indicated that one contract drawing No. 172873 was to accompany it, but there is no evidence that such a drawing was furnished by the Government or received by the plaintiff.
*410 The specification further provided that before commencing .any fabrication of the work the plaintiff was to submit for approval some eight drawings and engineering calculations for the design, strength, stresses and other data for the various parts of the cranes.
The following drawings were submitted by the plaintiff, with the date of final approval:

*411 The date of final approval is that endorsed upon the drawing. The plaintiff ordered materials for fabrication as soon as its drawings were approved, and sometimes before final approval. Copies of these orders were always furnished to the defendant.
14. The plaintiff’s engineers, George P. Wagner, Robert Goodman and Henry Jacoby discussed the drawings with John P. Wagstaff, the defendant’s design engineer. Defects were pointed out and corrected by revisions. The defendant’s engineer considered plaintiff’s drawings poorly prepared, in that the cranes were overdesigned, too strong, too heavy and too expensive. The cranes were built according to approved plans with changes, but were heavier and stronger than the cranes specified.

Changes

15. Drawing M-ll was originally submitted by the plaintiff with smooth drums for the main, luffing and auxiliary hoist cables. On April 8,1942, the defendant requested that these drums be designed with grooved surfaces to fit hoist cables of 1% inches for the main and luffing hoists and 1 inch cable for the auxiliary hoist. Grooved drums were not required in the specification.
The plaintiff’s actual cost of providing grooved drums was $11,164.83. The estimated cost of smooth drums at the time the change was made was $3,768. A board on changes, upon which the plaintiff was represented by Charles Goodman, reported December 2, 1942, awarding the plaintiff the net sum of $10,306.65 for providing grooved drums. The plaintiff was awarded this sum by the contracting officer on December 18, 1942, and made no protest or appeal from the award.
The net increased cost was computed in accordance with paragraph 27 of the general provisions of the specifications. The plaintiff was allowed 10 percent overhead and 10 percent profit upon its cost of the grooved drums, or a total sum of $13,509.45. The estimated cost of smooth drums at the time of the change was reduced by 15 percent to bring such cost down to comparable costs at the time the contract *412 was awarded, resulting in tbe net sum of $3,202.80. No overhead expense was included upon this adjusted net cost. The difference of $10,306.65 was awarded to the plaintiff for this change.
16. During discussions with the defendant’s chief design engineer1 the plaintiff was instructed to change the bronze bushings in high unit pressure areas to “lubrite,” a self-lubricating bearing containing a graphite powder or other nonfriction compound as a means of lubrication, and was directed to the Merriman Manufacturing Company as the maker and patent owner. The plaintiff thereafter provided lubrite bushings for all bearings designated by the defendant. Lubrite bearings were indicated in approved drawings for tEe sheaves which guide the hoisting cables, the wheel shafts or axles of the 36 wheels carrying the revolving superstructure, the housing around the gudgeon pins upon which the entire superstructure rides .upon the travel trucks, and other places designated by the Government.
Bronze thrust washers were provided at the hubs of the 36 wheels of the roller race with oil lubricating fittings, but these oil fittings were deleted by the defendant’s designers to avoid any oiling by the maintenance forces where lubrite was employed; the theory being that sufficient nonfriction powder would work out from the bearings during operations adequately to lubricate the bronze washers.
The plaintiff obtained its lubrite bearings from Merriman Bros., Inc., as well as quotations of similar bearings in plain bronze originally specified. The board on changes reported its determination of the plaintiff’s increased cost for lubrite bearings, which was computed in the identical manner as was the increased cost for grooved drums. The plaintiff was advised by the contracting officer of the determination of such allowance in the sum of $2,885.48 on December 18,1942. No protest or appeal was made by the plaintiff for this change.
17. Gear reduction waits. — The specifications called for the installation of gear reduction units between power plants and parts to be operated thereby to reduce the speed and increase the power of rotation.
*413 These reduction gear units are precision made complete and individually housed assemblies designed to deliver the percentage of reduction specified with the required strength and load capacity.
The installation of such units is comparatively simple, since they require connections only at points of reception and output of power.
The plaintiff made inquiry for the gear reduction units specified with a number of gear manufacturers in New York and Philadelphia soon after the contract was awarded, and was advised that deliveries could be made only in eight to twelve months. The plaintiff orally advised the design division of the Bureau of Yards and Docks of the late deliveries under its contract priorities and requested authorization for the substitution of an open spur gear assembly with a sheet metal covering which, though not as desirable as the gear reduction units, would serve the same purpose. The design division was agreeable to this substitution.
Thé defendant knew at the time the plaintiff submitted its bid that it could not possibly obtain the units specified within the contract period because they were difficult to obtain at that time and the Bureau was endeavoring to assist other contractors in obtaining them.
18. On April 8,1942, the plaintiff submitted a written request for the change of the gear drive to a spur gear reduction assembly, fully enclosed and floating in oil, as designed in its drawing M-ll, which it considered would cost more than the gear reduction unit specified. On the same day the defendant requested advice of any reduction in price if the substitution gear were accepted. The substitution gear assembly, as embodied in drawing M-ll, was approved July 4,1942, and was installed by the plaintiff.
The gear reduction unit specified was a shop finished unit, manufactured and assembled complete and ready for installation, whereas the approved substitution gear required the designing of integral parts and field adjustments and alignment of the assembly at a substantially greater cost to the plaintiff.
*414 19. A board on changes which met at Philadelphia on May 27, 1943, to consider contract termination adjustments and other matters, adopted a report prepared by the defendant’s chief estimator for that district which contained a reduction of $3,267 in the plaintiff’s contract price for the substitution of the reduction gear assembly.
The Chief of the Bureau of Yards and Docks as contracting officer adopted the board report for this change after eliminating a 10 percent reduction as profit, and determined that the contract price should be reduced in the net sum of $2,970. The plaintiff was advised of this decision by letter of August 20,1943.
The plaintiff made timely appeal from this decision and on December 20, 1943, the head of the Department of the Navy confirmed the decision of the contracting officer.
20. Eobert B. Burke, the defendant’s estimator who prepared the report for the board on changes prior to its meeting May 27, 1943, had no knowledge of the plaintiff’s actual cost for the substituted gear and did not have any plans of the gear reduction unit specified.
The reduction in the contract price for the change in reduction gears as reported by Burke, and adopted by the board on changes and by the contracting officer was based upon cost information furnished by the Falk Corporation and an employee of Dry Docks Associates who was engaged on work in the Philadelphia Navy Yard prior to May 27, 1943. The Falk Corporation estimated that gear reduction units for the two cranes should cost $6,480. William Keene, a mechanical engineer for Dry Docks Associates, advised Mr. Burke that the spur gear assembly should cost about $2,680 less or $3,800 for the two cranes. Burke adopted the difference of $2,680 as a saving to the plaintiff for the installation of the spur gear assemblies, to which was added 10 percent as a saving in overhead expense, 10 percent reduction in profit and 0.75 percent reduction in bond premium, and arrived at a total saving of $3,267, which, in turn, was adopted by the board.
Burke had no plan for the gear reduction unit specified, and none was prepared for consideration of these estimates. *415 No plans, specifications or other basic data in respect to the nnit specified or the substitution gears installed were furnished to the Falk Corporation representative at the Navy Yard or to Mr. Keene upon which costs of fabrication and installation might have been calculated. Burke had no knowledge of any sizes or nature of materials used by the •outside parties in their estimates since no details were furnished.
Neither the board on changes nor the contracting officer •complied or attempted to comply with paragraph 27 of the general provisions of specifications as contemplated by .article 3 of the contract on changes, in that no estimate was .made of the plaintiff’s actual cost of the spur gear assemblies installed and no estimate was made of the cost which the plaintiff would have incurred for the gear reduction units specified as of the time when the contract was made.
21. Paragraph 27 of the specifications stipulated the procedure in determining the adjustment in price in case of changes as contemplated by article 3 of the contract. It provides that in determining the contract adjustment, compari.son should be made of the estimated actual cost of the contractor for additions and the estimated cost to the contractor for deductions as of the time when the contract was made, plus due allowance, in the discretion of the contracting .officer, for overhead and general expense, and “to all estimates •of cost 10 percent shall be added for contractor’s profit.”
At the time the change to a spur gear assembly was made the cost of performance had increased by approximately 15 percent over and above such cost existing at the time the • contract was consummated. This difference in cost was adjusted in the change “A” for grooved drums and lubrite bearings, as determined by the contracting officer. A reason.able allowance for overhead and general expense is 10 percent of the installation costs, which percentage was used by the contracting officer in his determination under change -“A” for grooved drums and lubrite bearings.
A fair and reasonable adjustment in the plaintiff’s contract for the change from gear reduction units to the spur .gear assemblies for the two cranes is an increase of $2,109.48. "■The comparative cost for each crane follows:

*416

The increase for each crane was $1,054.74 and for two ■cranes $2,109.48.
The finding of the contracting officer and the head of the department was not supported by substantial evidence and was capricious and grossly erroneous.
22. Conical rollers and roller -path. — The specifications provided that the revolving section of the crane consisting of the machinery house, boom and other operating equipment would be mounted upon a frame which could be rotated in a complete circle.
The means provided for rotating this upper section consisted of upper and lower heavy steel circular castings or rails with surfaces machined to a conical shape, known as the roller path. Conical rollers were to be provided between the upper and lower rails of the roller path as bearings upon which the upper section could be rotated in a circular motion.
The lower section of the roller path would be bolted to the stationary platform or gantry of the crane, whereas the upper section would be secured to the upper revolving frame immediately above the lower rail. The rollers were to be held in place by a rigid cage having radial members centered around the kingpin similar to spokes in-a wheel, known as the spider.
The roller path formed a complete circle approximately 25 feet in diameter and required a very large mill to machine the surfaces to a conical shape to fit the conical roller bearings. Such a milling machine was not available for the necessary machining of the roller paths.
23. The plaintiff originally submitted a drawing for the rotating mechanism embodying the roller bearings and cast steel roller path, which was discussed with defendant’s chief *417 designer, John P. Wagstaff. When the,question arose whether or not a boring mill could be obtained for the necessary machining of the roller paths, Mr. Wagstaff suggested a change in the rotating mechanism from roller bearings and roller path to 175-pound rails and wheels with toughened rims and flanges to fit between the rails.
Thereafter the plaintiff submitted drawings M-13 for the roller cage assembly and M-14 for the rotating mechanism, both dated March 15, 1942. These drawings show designs for 175-pound Lorain circular rails 25 feet in diameter, similar to the size used for railroad tracks, and 36 flanged wheels 14 inches high to carry the revolving superstructure. The wheels were flanged only on the inside and the axles holding them in position between the rails appeared to be centered around the center pin. The rails were bolted to the upper revolving frame and the lower stationary frame upon a %-inch steel plate with bolts one inch in diameter.
On April 8, 1942, the defendant returned drawings M-13 and M-14, advising in part:
If a boring mill of sufficient capacity cannot be located to finish off the roller path, the Bureau will give consideration to the use of 175-pound rails with double-flanged rollers.
The rails and wheels design was revised to provide flanges on opposite sides of the rails on alternate wheels in lieu of the double-flanged wheels and it was approved by the defendant July 4, 1942. The rotating mechanism was constructed in accordance with the approved design. The rails and wheels are acceptable as a rotating mechanism, but the design of the conical rollers and roller path is a more advanced method, and provides smoother operations in handling heavy loads.
' 24. The board on changes met May 27, 1943, and adopted a report prepared by the defendant’s chief estimator for the Philadelphia district which contained a reduction of $11,215 in the plaintiff’s contract price for the substitution of rails and wheels for the rotating mechanism in lieu of the conical rollers and roller path originally specified.
The Chief of the Bureau of Yards and Docks as contracting officer adopted the Board’s report for this change after *418 eliminating a 10 percent profit reduction, and determined! that the Government was entitled to a credit of $10,196. The plaintiff was advised of this decision by letter of August 20, 1943.
The plaintiff made timely appeal from this decision and on December 20, 1943, the head of the Department of the Navy confirmed the decision of the contracting officer.
25. Robert B. Burke, the defendant’s estimator who prepared the report for the board on changes prior to its meeting' May 27, 1943, had no knowledge of the plaintiff’s actual cost for the rotating mechanism installed in the cranes. He made-no calculations of comparative costs between the conical rollers and roller path specified and the rails and wheels actually installed, and did not know that the rims and flanges of the wheels were toughened steel.
The reduction in the contract price reported by the board-on changes and determined by the contracting officer, was-based upon differences in costs estimated by á representative of the Dravo Corporation and by William Keene, a mechanical engineer for Dry Docks Associates, who was working in. the Philadelphia Navy Yard prior to May 27, 1943. Mr. Keene estimated the conical rollers and path at a cost of $2,830 and the flanged wheels and rails at $1,290, or a difference of $1,540. The Dravo Corporation estimated a saving-of $6,000 by the use of flanged wheels and rails. Mr. Burke-estimated that the weighted average of the other two estimates would be $4,600 on each crane or a total savings in cost of $9,200. To this sum was added 10 percent overhead and 10 percent profit, plus 0.75 percent for bond premium as reductions in these classifications, resulting in a total credit to the Government of $11,215.49.
Neither the Dravo Corporation nor Dry Docks Associates was furnished- with any plan of the conical rollers and roller path specified or of the flanged wheels and rails as constructed for estimating their comparative costs. And no details of their weights or prices of materials or other estimates were furnished by them.
Neither the board on changes nor the contracting officer complied or attempted to comply with paragraph 27 of the *419 general provisions of the specifications as contemplated by-article 3 of the contract, in that no estimate was made of the plaintiff’s actual cost of the rotating mechanism consisting of rails and flanged wheels and no estimate was made of the cost which the plaintiff would have incurred for conical rollers and roller path specified as of the time when the contract was made.
26. The plaintiff’s increased cost of installing 175 pound rails and wheels with toughened rims and flanges over the' estimated cost of installing rollers and roller paths as a rotating mechanism at the time when the contract was made, in accordance with paragraph 27 of the specifications, was $3,844.46.
The comparative cost for each crane follows:

Increase for one crane was $1,922.23, and for two cranes $3,844.46.
The finding of the contracting officer and the head of the department was not supported by substantial evidence and was capricious and grossly erroneous.
27. Additional one-inch cables. — The main and luffing hoist drums were grooved for 1%-inch cable, and the auxiliary hoist was grooved for 1-inch cable. When the first crane, AL-109, was tested on February 16,1943, it was discovered, among other things, that the main hoist cable would sometimes jump off the fleeting sheave and foul upon the drum. This occurred when the hoist block and tackle hook was lowered to the lowest point in the dry dock and without the tension of a loaded hook. A similar condition was noted when the second crane, AL-110, was first tested. Both *420 cranes were put into use because of the urgent need for them. Final inspection was made of both cranes April 17, 1943, but they were not accepted.
The drums were grooved by the New York Engineering Corp. to the nearest size and tolerance acoording to standards of commercial practice and upon approved plans presented by the plaintiff. The grooves were 1.131 inches on centers, or slightly in excess of 1 ys inches. The defendant contended that the grooves were too close to allow free winding of the li/g-inch wire cable for the main hoist. The cable followed. the grooves properly in regular operations and only jumped the grooves at the times when the block and hook were lowered to the extreme depth required, causing too great a fleet angle as the cable reached the last turns on the drum. The length of the cable specified and furnished was 760 feet, whereas the cable unwound 730 feet at its greatest reaches, leaving only one or two turns at the extreme side of the drum. Mr. Wagstaff, the defendant’s design engineer, believing that the drums were grooved too close for the 1%-inch cable, suggested a 1-inch cable of stronger type and equal capacity to the 1%-inch cable specified.
28. The final termination of the plaintiff’s work on the contract was ordered by the defendant on February 25,1943. By letter of March 23, 1943, the plaintiff offered to furnish the 1-inch cable suggested by Mr. Wagstaff, for the replacement and return of the 1%-inch cable which could have been readily disposed of at that time. The defendant continued the use of the original hoist cables without replacement, but contended they were not satisfactory.
On April 5, 1944, the plaintiff shipped 2 reels of 1-inch cable of 850 feet lengths and 46-ton breaking strength, for replacement of the main hoist cables on the two cranes. The' plaintiff claimed $850 for these cables, since the original cables had been in use over a year at that time. During July or August, 1944, when crane No. 109 was being overhauled, the 1-inch cable was installed on the main hoist drum, and no further difficulty was experienced with the cable jumping out of the drum grooves. The 90 feet of additional length over that originally specified permitted approximately seven full wraps to remain around the drum at the *421 lowest reaches of the hook. The 1-inch cable was installed on the main hoist drum of Crane No. 110 about January or February of 1945.
• The additional cables furnished by the plaintiff cost $718.40, plus freight of $107.21 to Philadelphia, or a total cost of $825.61. Plaintiff has not been paid any amount by defendant on this item.

Critical Need of Cranes and Overtime Directed

29. The award of plaintiff’s contract on December 6,1941, was immediately followed by the declaration of war, increased prices of materials, and more restrictive allocations for critical work. On January 9, 1942, the public works officer wrote the plaintiff that the cranes were urgently needed, and inquired whether their construction could be expedited by working 24 hours a day 7 days a week.
The plaintiff was advised by one of its material suppliers on March 13, 1942, that its. quotation on rack castings and rail sections could be placed in production April 1, but that deliveries could not be completed for about 10 weeks unless the plaintiff could supply an AA priority. The Diesel generators were ordered in December 1941 for May delivery, but were not delivered until November 1942. Changes and substitution of materials were made for certain parts because. of protracted delivery dates designated by suppliers under plaintiff’s contract priorities.
On'June 20, 1942, the assistant public works officer again advised the plaintiff of the urgent need of the cranes and that an AA priority had been applied for on its contract, requesting advice of any delay in needed material that could be procured under the AA priority. A new priority rating of AA-3 was issued on the plaintiff’s contract July 15, and rerated to AA-1 on August 4,1942.
The Government office at the Philadelphia Navy Yard and the supervising engineer’s office in New York City cooperated with the plaintiff in procuring materials and in expediting the work to the greatest extent possible. The defendant also employed an expediter to follow up the plaintiff’s work, and that of its subcontractors, to get the fabricated parts at the site for erection as quickly as possible.
*422 30. On July 31, 1942, the defendant wrote the plaintiff as follows:
1. Progress on erection of the subject cranes has not been satisfactory. These cranes are vitally needed in connection with a shipbuilding program carrying the highest priority. It is essential that you immediately put forth greater effort to speed usable completion of these cranes. More materials should be furnished at the site at the earliest possible date.
2. You are directed to utilize all facilities and manpower available to the fullest extent possible wherever such utilization will insure sooner usable completion of the cranes. Under this direction, you should work seven days a week, twenty-four hours a day whenever this procedure will effect quicker completion of the cranes.
3. In connection, with payments for overtime, the employee must first work a full shift at regular time on this contract before he can be authorized to work overtime on this contract at additional cost to the Government.
4. You are hereby instructed to direct your subcontractors and suppliers to work on same basis as outlined above wherever completion of the cranes will be expedited by so doing. Please advise this office what specific steps you will take to effect faster delivery of required parts for the cranes and faster completion of erection.
On August 8, 1942, the defendant wrote the plaintiff of the urgent need of the cranes and requested that the plaintiff furnish firm dates of deliveries of parts, and the time necessary for erection of the cranes in order that the Government’s shipbuilding program could be intelligently scheduled.
On September 18, 1942, the defendant again wrote the plaintiff directing that every possible effort be made to have the cranes erected by November 6, that overtime be employed to the fullest extent possible to meet this completion date, and that the additional cost of this overtime work would be borne by the Government.
The defendant thereafter continued urgent persuasion and pressure upon the plaintiff to expedite deliveries of the fabricated parts and erection of the cranes. The defendant later employed mechanics under a separate contract who were engaged at the Philadelphia Navy Yard to assist in the erec *423 tion of these cranes and ultimately terminated the plaintiff’s ■contract, as hereinafter reported. ■
The usable completion of the first crane was about February 16, 1943, and the usable completion of the second crane was about the middle of April 1943. Neither crane functioned satisfactorily when first tested, and both of them required adjustments and some additional work to finish construction. They were both put to use at the Philadelphia Navy Yard, but were not accepted in satisfaction of the contract.
31. The plaintiff incurred increased labor costs of $4,993.20, ■represented by premium pay for overtime, as a result of the ■defendant’s authorization and request that labor be employed ■overtime to the greatest extent possible to expedite delivery ■of the cranes.

Complexities in Performance and Contract Termination

32. The plaintiff’s shop and that of its subcontractor, New| York Engineering Corporation, which performed substantially all of the machining work, were located in New York. The cranes had to be erected out upon piers of the Philadelphia Navy Yard. The normal and proper procedure would have been to complete the fabrication of the various parts re■quired for the assembly of these cranes at the shops and then to have proceeded with the erection of the cranes after the parts were delivered to the site. The trucks were to be placed upon the rails and erection was to continue upward.
Certain parts of the cranes were completed in advance of -other parts and were delivered to the erection site as completed. Erection of the cranes was started in July 1942. The gantry section as well as the revolving platform was assembled upon block supports on the ground, in order to advance the work. These units had to be hoisted and placed upon the trucks after the structural steel members had been constructed. Work proceeded in the yard for about one and one-half months when it was discontinued because the trucks and other parts had not been completed and delivered. The critical parts that delayed erection at that time were the, trucks, racks and rotating mechanism and hoist machinery.
*424 The shipment of steel required, for trucks had not been completed until July 1942. Changes in the rotating mechanism and hoist drums also delayed the completion of these; parts.
33. The public works officer sent an expediter to New York to expedite the delivery of the trucks and machinery and to make vigorous efforts to have this additional equipment, shipped so that construction of the cranes could proceed.
The plaintiff protested the release of the trucks until they had been properly completed in the shop, because machine-finishing and adjusting of the parts could be performed better and more economically in the machine shop. The assistant public works officer Kline ordered the trucks and other necessary equipment delivered to the site, and assured the plaintiff’s officials that the Navy had qualified mechanics at the Navy Yard and would cooperate so that the plaintiff would not incur excessive costs for additional machining of the parts in the field.
On September 22, 1942, a set of four trucks for one crane was shipped, and on the same day the plaintiff wrote the public works officer as follows:
In answer to September 18, 1942, letter signed by Commander Nicholson, please be advised,
(1) Erection work in Philadelphia should be resumed at the earliest practical time, when it becomes clear materials are on hand. Otherwise it may be difficult to get steel erectors to work on job. Our center pins should be ready September 30th, or earlier.
(2) We believed our trucks should be shop completed before going to Philadelphia. However, we agreed to send four out of a total of eight today on order of Mr. Welsh, of Lieutenant Glaze’s office, who said Commander Kline would cooperate to save us field machinist work of installing shafts, gears, gear guards, fenders, and rail checks.
We hope to have the last four trucks in less than four weeks. We have not been able to get machinists to work a second shift.
(3) We understand the New York Engineering Co., of Yonkers, are working to have hoist engines ready October 11th. We must advise that these hoist engines should be properly shop finished before being sent to Philadelphia.
*425 (4) We hope our 200-kw. Burke Generators will arrive, before September 30th. These were ordered for May 5,1942, delivery.
We note your letter states every effort should he made by us to have cranes completely erected by November 6, 1942.
34. The trucks were delivered to the site before they were .completely finished and tested. They lacked rail guards, rail '.brushes, and fenders, but these auxiliary units would not prevent the erection work, and defendant’s project manager advised the plaintiff that the cranes would be used without them.
Hoist machinery and the rotating mechanism were also removed from the shop and sent to the erection site before -they were properly finished and tested, and the plaintiff found it necessary to bring machinists and shop equipment •to the site to rectify this work during the progress of the • erection.
35. The plaintiff contends that its costs were increased in the sum of $4,644 by reason of performing much of the ma.chining and adjusting work in the open weather on the Navy piers which should have been completed in the shop before : shipment. The plaintiff incurred field costs of $5,094.90, on -.the trucks and hoists alone. It is not possible to determine the portion of work performed in the field that should have been performed in the shop, nor the difference in costs.
The trucks, hoist winches and rotating mechanism were subcontracted and fabricated by the New York Engineering -Corporation. The employment of mechanics in the field, unfamiliar with fabricating processes, and without the use of shop equipment, would result in some increase in. cost to the plaintiff, but there is no basis in the record for deter.-mining the amount of this increase.
36. Charles Goodman was primarily engaged in the fabrication of the cranes and the procurement of material. He •seldom came to the site of erection, except at interesting points, or for discussions with defendant’s officials.
Erection work was started under the supervision of Eobert -Goodman, son of Charles Goodman.: Henry Jacoby, his son-:in-law, came to the site November 19, 1942, and remained *426 until April 1943. Both of these were young men, graduate engineers, intelligent and willing, but lacking experience in the design and construction of a whirler crane.
The defendant’s project manager, Lieutenant Hutchinson, had no experience in crane construction prior to his arrival at the Philadelphia Navy Yard in 1941, but was regularly at the site and cooperated with the plaintiff’s men on erection work.
The defendant contends that the plaintiff’s erection supervisors lacked experience in obtaining material and in the organization of work for efficiency. The facts indicate that the erection of these cranes did not and could not proceed in an orderly fashion because the deliveries of materials for fabrication, and equipment required in the assembly, were not received at the times needed. Plaintiff’s priorities were not high enough.
The defendant contends that construction was delayed by late delivery of the kingpin because the plaintiff did not know how to design it, and that the defendant showed plaintiff’s designers several ways that it could be done. The plaintiff prepared and discussed all drawings with the defendant’s head design engineer. Drawing M-12 was issued March 15, 1942, for the kingpin which was approved May 12, subject to corrections, being one of the first drawings approved by the defendant. Invoices of materials for the kingpin are dated May 30 and June 11, 1942. It was machined by the New York Engineering Corp. and was delivered about the time erection of steel was started. No delay was attributable to the delivery of the kingpin.
37. On November 26, 1942, the public works officer wrote the plaintiff, enclosing a schedule of erection work performed on the cranes which was considered too slow, and requested a definite work schedule for the completion of both cranes. The letter stated, “Continued slow action on this contract is of grave concern to all at the Yard.”
On December 9,1942, the public works officer wrote plaintiff that little progress had been made in the field during the previous two weeks and stated “your prompt action would be appreciated to expedite same.”
*427 On December 18, 1942, a directive was issued removing from the job the steel sheet metal men of Iron Workers Company, one of the plaintiff’s subcontractors. Beginning December 19, 1942, the defendant obtained other workers to perform the remaining sheet metal work of covering the cabs of the machinery houses, installing floor plates, ladders, platforms and other ornamental iron work. These men were said to have been furnished through the Dry Docks Associates who were then engaged in the Philadelphia Navy Yard under a cost plus fixed fee contract. December 19, 1942, was the first time the Government sent men to work on the plaintiff’s crane contract.
The plaintiff’s erection supervisor had not requested assistance up to that time. He did not know that the men were being sent and had no control over them and the work being performed by them. The plaintiff was not immediately notified of the removal of its subcontractor, Iron Workers Company, and the defendant gave no reason for this action. The plaintiff’s officers understood and believed that men being furnished by the Government would not be charged to plaintiff’s contract, unless requested by them.
The plaintiff’s supervisor on erection thereafter requested assistance from Dry Docks Associates for constructing forms for and pouring the counterweights, because the Navy had no equipment for this type of work and the plaintiff experienced difficulty in obtaining such equipment. Work on the counterweights was commenced December 23, 1942.
38. On January 7,1943, the public works officer wrote the plaintiff as follows:
1. In order to provide sooner usable completion of the subject cranes, the Officer-in-Charge has determined it to be advantageous to delete certain items of work from the subject contract. The exact value of the items to be deleted from the contract will be determined by a Board on Changes in accordance with provisions of the contract. In order to assist this office in analyzing the items prior to a meeting of a Board on Changes, you are requested to submit a detailed estimate covering the following items which are to be deleted from your contract :
(a) Furnish labor and tools to complete sheeting on the machinery houses of both cranes as of December 19, *428 1942. This item to also include installing one small door in machinery house of one crane and one large, and one small door in machinery house-on the second crane.
(b) Furnish labor and tools to install three sections of ladder and one platform on gantrys on both cranes and two sections of ladders and three platforms on machinery house and “A” frames of both cranes and all hand railing on both cranes.
(c) Furnish labor and tools for placing concrete counterweights (approximately 50 cubic yards) for both cranes, including any miscellaneous labor involved in placing reinforcing steel or on form work.
(d) Furnish crane service for miscellaneous hoisting of material into the machinery spaces of the two cranes.
2. In addition to the foregoing, it may prove advantageous in the interest of completing the cranes in the earliest possible time to omit other miscellaneous work from the contract. The omission of any other miscellaneous work will be treated as a change under the contract and will be considered by a Board on Changes appointed to estimate the cost of the work omitted and the change in time involved.
This was the first written notice to plaintiff that any part of its contract work was to be deleted. At that time the,labor cost, including overtime, for work performed by Dry Docks Associates after December 18, 1942, was $8,827.32 on sheet metal work, $525.69 in constructing the counterweights, and $200 on pipe installation, which sums were later included with the charges by the Government for completing plaintiff’s contract.
39. On February 25,1943, the public works officer wrote the plaintiff, terminating its contract and deleting all remaining items of work. This letter reads as follows:
1. There are numerous small items as well as five major items of work remaining to be completed on the subject cranes in order to make the cranes acceptable under the specifications. The main items are as follows:
(a) Correct defective operation of spreader sheaves.
(b) Correct defective operation of main hoist fleeting sheave.
(c) Correct construction of journals to permit proper lubrication and maintenance. _
_ (d) Furnish ratchet device for boom hoist drum.
(e) Furnish swivel hook for main hoist.
*429 2. It lias been determined to be for tbe best interest of the Government to delete the remaining items for completion of the cranes from your contract. This work will be performed by others. You should stop work on the contract immediately and remove all your construction material, tools, buildings, etc. from the site at once. Forward your detailed estimate of credit for the remaining items to be completed for consideration by the Board on Changes in making a change in contract price in accordance with terms of your contract.
At that time all sheet metal installations, ladders and platform work had been completed by men furnished by the defendant at labor costs of $4,971.57; the counterweights had been completed, except welding the counterweight and fair-leads, at labor costs of $1,002.64; and labor had been employed on machinery, painting, piping and other classifications. Total labor costs for workers furnished between December 18, 1942, and February 25, 1943, including overtime, were $8,953.37.
The plaintiff’s erection supervisor was authorized to remain on the job to lend assistance, and to look after the plaintiff’s interests. He remained until April 1943.
Oom/pletion Costs, Other Changes and Corrective Work
40. On February 15, 1943, the public works officer wrote ■the plaintiff that under paragraph 2-05.3, the plaintiff would he required to provide a suitable ratchet with engaging pawl and electric interlock for the boom, and double-barbed hooks of the antifriction bearing swivel type in place of the.single hooks supplied for the main hoist. This letter also states:
4. In order to rush completion of the subject cranes a large amount of miscellaneous work has been performed by others. You are requested to submit an estimate of the credit to be allowed, for the performance of this work. This estimate will be used as part of the data considered by the Board on Changes in arriving at a change in contract price, in accordance with the terms of your contract.
By letter of February 16,1943, the plaintiff denied responsibility for the ratchet and pawl locking device and the swivel type double-barbed hooks requested. This letter .stated in part:
*430 Paragraph (4). — On September 22, 1942, regarding trucks, we wrote advising you of extra field expense occasioned by machinery shipments before shop work was completed. This was also the case for rotating engines. We expect to forward bills for this. We do not object to paying for men requested by us. Some of your men were put on our job, as we understood, to be without expense to us. We did not believe these extra men would be of any real help to us.
:fi * sje ‡ #
We respectfully request that the Government renegotiate our contract to allow us our cost, because having been executed in wartime, it would appear to come under Article 4 clause, change of conditions.
41. Upon a request of the plaintiff that a meeting of a board on changes be arranged, the public works officer, on May 7, 1943, designated the date of May 25, 1943 (changed later to May 27, 1943), and invited Charles Goodman to attend as the contractor’s representative. Mr. Goodman was requested to bring with him complete data to properly discuss some 16 items listed by the public works officer, including the cost of contract work completed by Dry Dock Associates, changes and certain corrective work allegedly required.
42. By letter of April 12, 1943, the plaintiff submitted to the defendant a tabulation of its field labor costs on machinery for the period November 21,1942, to February 27, 1943, totaling $5,534. The plaintiff claimed that 70 percent of such labor costs, $3,870, represented the excess costs in the field for work that should have been completed in the shop before the machinery was ordered out to the erection site. To this sum the plaintiff added 10 percent overhead and 10 percent profit, with payroll taxes and insurance for a total claim of $4,644.
The public works officer replied by letter of May 22,1943, and submitted to the plaintiff a tabulation of labor performed by others under Government direction during the period December 19,1942, to March 25,1943, totaling $11,276.37. This letter reads in part:
1. Reference (a) indicated that crane AL-109 has been regularly working since February 10 and crane AL-110 since April 7. Crane AL-109 was not tested until February 16. At that time the crane failed to *431 perform satisfactorily in accordance with the specifications. Specifically, it would not start on a curve with a load, the boom could not be raised to 60 ft. radius because the boom hoist cable would jump the sheave and the main hoist cable would not lead properly onto the drum. Due to the extreme urgency for crane service, the crane was put into use but not accepted with the thought in mind of correcting the defects after crane AL-110 was in use. This procedure was subsequently followed.
2. Crane AL-110 failed to pass performance tests when initially tested in that it would not go around curves satisfactorily either with or without a load. It was decided to use this crane during the period that modifications were made on AL-109 so that the crane would limber up with use? and then to re-test it when AL-109 was back in service. This was done, and on April 17 crane AL-110 successfully negotiated curves with a load. The final acceptance inspection was made on crane AL-109 at that time. Both cranes met specified conditions as to weight handling ability and speed of travel. However, the main hoist cable does not stay in the groove on the drums of either crane when the cable is being wound on the drum near the extreme end of the cable. It has been decided to conditionally accept the cranes even though they do not perform properly, since correction of this defect indicates a major structural change in the cranes would be needed because the angle of lead of the cable onto the main hoist drum is too high. The fleeting sheaves are working properly and are fleeting to the extreme end of the fleeting shafts. Even with this condition, however, the angle of lead is too high onto the drum. This condition was called to your attention by the Bureau’s letter of January 14, 1943. In lieu of requiring you to correct this defective condition, it is felt advisable to make an equitable reduction in contract price. This matter will be considered by the Board on Changes.
3. In addition, there are many other deviations from the specifications that will be considered by the Board on Changes in making adjustments in the contract price. * * *
Numerous deviations in the contract requirements were cited in this letter. The several items will be discussed in connection with the amounts claimed for correction by the defendant.
*432 43. The Board on Changes met May 27,1943, at Philadelphia and adopted a report of estimates of contract reductions totaling $43,994 previously prepared by Robert B. Burke. The plaintiff’s representative was handed a copy of this report and advised that it was adopted as the board’s report, and the plaintiff’s representative was given no opportunity to discuss any part thereof. The said report contained estimates of work performed by Dry Docks Associates under Government direction, all changes not previously disposed of and other items of work allegedly required to correct defective work or faulty operations of the cranes.
The plaintiff wrote the public works officer on June 3,1943, claiming increased costs of certain changes performed by it, and on June 18,1943, submitted a minority report and tabulation of estimates wherein it claimed increased costs of $67,271.82, after allowing for offsets of $2,614.40 for work performed by others under the defendant’s direction.
44. By letter of August 20,1943, the plaintiff was advised by E. L. Marshall, by direction of the Chief of the Bureau of Yards and Docks, as contracting officer, that after a review of the majority and minority reports the Bureau found that reductions of the contract price for most of those items considered by the Board were justified and offered a settlement by a reduction of $34,120 on items listed. The total of the items listed was reduced to $29,126.80, by applying a credit of $4,993.20 for overtime premium payments, as reported in finding 31 herein.
45. On September 15, 1943, the plaintiff duly appealed from the offer of settlement by the contracting officer under Article 15 of the contract.
December 20,1943, the acting Secretary of the Navy wrote the plaintiff that the determination of the Chief of the Bureau of Yards and Docks should be confirmed.
46. The amounts reported by the Board and proposed by the contracting officer as reductions in the plaintiff’s contract price are, in many cases, arbitrary, capricious, grossly in error, and not supported by substantial evidence. They are further reported in the findings and references following herein. There is, however, no proof of conscious wrongdoing or of an intention to cheat or defraud plaintiff on the part *433 of the contracting officer or the acting Secretary of the Navy.
47. The estimated sums contained in the report adopted by the Board on Changes, and amounts proposed for settlement by the contracting officer as reductions in the contract price for corresponding items, are set forth in the following table:

Items a, b, and c are covered in the section of this report dealing with, changes.
The defendant never incurred the costs reported after item a. It did not purchase or install the cables. Because of difficulties in operations reported by the defendant to the plaintiff, the plaintiff purchased and delivered new one-inch cables for the main hoist boom of each crane in April 1944. The change in cable of the first crane was made about July 1944, after the crane had been in use for approximately one year and four months upon a critical ship-building program and was being overhauled. The facts on this item are reported in findings 27 and 28. Defendant has withdrawn its charge for this item.
*434 The reductions of the contract value under items b and c and the facts relating thereto are set forth in findings 17-21 for item b, and 22-26 for item c.
48. Item d. The contracting officer determined that the Government’s cost in completing the erection of the cranes was $13,322. In its letter of May 22, 1943, referred to in finding 42, herein, the Public Works Officer submitted to the plaintiff a detailed tabulation of labor performed by Dry Dock Associates on the cranes under his direction, and the cost of additional materials furnished. This tabulation designated work performed for the account of the plaintiff, the Woolston Wood Company, the plaintiff’s subcontractor for pipe installation, and the Noye Sheet Metal Company. The last named company obviously should have been referred to as the Iron Workers Company, the plaintiff’s subcontractor for sheet metal work, stairs and platforms, which company was operated by one William L. Noe.
The tabulation of the defendant’s labor and materials costs are summarized in the following table:

Work performed on the cranes under defendant’s direction during the period from Dec. IS, 19J¡2, to Mar. 25,1SJ¡S

*435 Work 'performed on the cranes under defendant1 s direction during the period from Dec. 19, 194%, to Mar. $5, 194S — Continued

This letter also contained a list of additional work to be done after March 30,1943, on crane AL-109, and designated as No. 1 of the plaintiff’s two cranes. The list included estimated labor costs as follows:
(n) Change journals and place stop rings_ $320
(o) Cheek plates on load blocks_ 200
(p) Repair gudgeon bushings_ 300
(q) Place spreader counterweight_ 250
(r) Adjust fleet sheave and change slots_ 100
(s) Pipe covering on muffler_ 100
(t) Guards for hooks- 200
Total_1,470
49. The additional work on the plaintiff’s cranes was performed by Spencer, White & Prentice, Inc., Foley Brothers, Inc. and Merritt-Chapman & Scott Corporation, operating as Dry Dock Associates under its cost plus fixed fee contract No. 4100, which was changed to include this work. In its final settlement with Dry Dock Associates the defendant paid the sum of $14,718.38 for labor and material al-locable to the plaintiff’s cranes.
The defendant also employed Navy Yard cranes for 130 hours in hoisting steel sheet, concrete for counterweights and *436 other purposes, for which a rental charge of $13 an hour was made in the sum of $1,690.
50. The plaintiff contended that the defendant’s costs of completing the cranes were excessive, and involved changes and overtime premium pay for which the plaintiff should not be charged. The plaintiff’s estimated cost of completing its contract work was $2,614.40.
The labor performed by Dry Dock Associates included premium pay for overtime of $1,353.06.
51. There is no evidence of any specific reason for the removal of plaintiff’s subcontractor Iron Workers Company from the job on December 18,1942, other than an urgent need of the cranes, and a belief that the work could be expedited with other workers. All structural steel frame work had been completed, and the ladder stairs and plaforms were fabricated and partially installed.
The plaintiff’s subcontract for installing ladders and platforms was $2,350, for which a deduction of $200 was made for uncompleted work. The plaintiff paid $2,150 to its subcontractor. The labor costs of this work by Dry Dock Associates was approximately $787.73.
The cabs required approximately 2,600 square feet each of 14 gauge sheet metal covering, or about 5,200 square feet for both cranes. The plaintiff’s subcontractor had installed 3,002 square feet, at a cost of $2,754.48, or 92 cents per square foot, including 9 percent payroll taxes and insurance and 20 percent overhead and profit. The remaining 2,198 square feet of sheeting was installed by Dry Dock Associates at labor costs of $3,746.59 or $1.70 a square foot, exclusive of payroll insurance, taxes and overhead expenses.
The plaintiff’s subcontractor had bolted the sheeting to the cab frames, considering this a more satisfactory method for removing it in event of changes in machinery inside the cab. The sheeting installed by Dry Dock Associates was welded, which resulted in some damages requiring correction. There is nothing in the specification requiring that the steel sheeting on the cabs be welded, and there is nothing to indicate that sheeting previously installed was later welded.
52. All piping work required by the specifications on the diesel generator, water, oil and air lines was subcontracted by the plaintiff to Woolston Wood Company. It was com *437 pleted by them and the plaintiff paid its subcontractor in full for this work. The plaintiff contended that the backcharges of $499.20 on account of Woolston Wood Company in January 1943, as well as the additional pipe fitting charges in March of $183.88 under item 3 (g) of the foregoing tabulation represent changes for which the plaintiff is not responsible. There is nothing in the evidence to indicate where the pipe installations were made. Some additional pipes and handrails were installed to facilitate the work of the maintenance men and as safety measures in oiling machinery.
53. The plaintiff concedes the charge of $1,271.60 for counterweights under item 3 (a). The plaintiff estimated additional work on the booms at $213. The labor costs by Dry Dock Associates in January 1943 was $435.08. Additional work was performed on the sheaves in March 1943 at a cost of $229.63. The sheaves are small wheels that carry the cable along the boom to the load hook. Lubrite bearings were provided for the sheaves. They would not turn freely to permit smooth travel of the cable. The lubrite bushings were later replaced entirely and plain bronze bushings were installed with provision for lubrication. The lubrite bearings were installed by the plaintiff pursuant to the defendant’s change order, and as directed. The cost of adjusting the sheaves, and their ultimate change and elimination made in defendant’s counterclaim, are not properly chargeable to the plaintiff’s contract work.
54. The defendant incurred costs of $151.93 in January 1943 for bolting the roller race, and $60.23 in March 1943, for work on the rotating mechanism. The roller race was fabricated by the plaintiff’s subcontractor, New York Engineering Corporation. It was constructed according to approved plans and tested upon duplicated tracks. Its installation was completed by the plaintiff. The circular tracks were installed to a true diameter of 25 feet. After installation the wheels would not turn freely in rotating because the lubrite bearings did not function satisfactorily. The defendant decided that the frame was too rigid and authorized the Dry Dock Associates to change the bolts from 1 inch to % inch, which permitted more freedom of the roller frame.
*438 Tbe plaintiff’s drawing M-13 provided lubrite bushings for the wheel bearings and bronze thrust hub washers with holes for lubricating the washers. The provision for lubrication of the washers was deleted by the defendant upon the theory that the lubrite bushings would also provide adequate anti-friction for the washers. Temporary methods were employed by the defendant to keep the cranes in operation and oil was poured over the thrust washers to prevent their disintegration. The lubrite bushings were later replaced entirely, the 1-inch bolts were restored, and a lubrication system was installed. The cost of this change was asserted as item 5 in defendant’s counterclaim.
55. The defendant’s backcharges include the sum of $692.85 for labor on the journals and top bearings of the trucks. Each of the four wheels of the truck contained a journal designed to carry the lubrication into the axle or shaft bearings upon which it turned. Each of the four trucks which carried the superstructure was provided with a large lu-brite bearing which was designed to slide upon a heavy gudgeon pin to permit free movement of the crane in travel. Each of the trucks was provided with a 33-hp. electric motor for moving the crane.
The trucks stood out on the pier all winter during the erection period and the wheel bearings became frozen to the shafts. They could not be moved under their own power. The defendant employed a steam locomotive to move the cranes which dislodged the bearings. The top bearings would not slide upon the pins as planned, which caused unequal weight and strain upon the structural members. The lubrite bearings were ultimately replaced by heavier lubricated bearings, the cost of which was included in item 11 of defendant’s counterclaim.
The work on the journals was to change the design to provide openings to facilitate inspection and lubrication. The work on the lubrite bearings represented temporary maintenance to keep the cranes in operation.
56. The additional work to be done on crane AL-109 after March 30, 1943, estimated at $1,470 (finding 48) apears to be included in the total estimate of $13,322, for completing *439 the cranes, except the last item which was backcharged as item (n) in finding 47.
The change of the journals and placing stop rings at an estimated cost of $320 constituted a change in design. It is comparable to the costs incurred on the other crane for similar work, set forth in the preceding finding herein.
The placing of cheek plates on the load block, at an estimated cost of $200 also constituted a change in design. The purpose was to add weight to the tackle and give greater rigidity to the heavy wire cable in lowering the unloaded hook.
The repair to the gudgeon bushings at an estimated cost of $300 constituted temporary maintenance of the lubrite bearings, as set forth in the preceding finding. The lubrite bushings were later replaced throughout the cranes wherever they had been installed.
The placing of a steel spreader counterweight was estimated at $250 by the defendant and $100 by the plaintiff. There were no details submitted of the defendant’s estimate. No separate backcharge was made for this item.
The estimated cost of $100 to adjust the fleet sheave and change slots constituted an item of temporary maintenance. It became necessary by reason of the design and installation of lubrite bushings.
The estimated cost of pipe covering on the muffler at $100 is excessive. The actual labor cost of this work on the other crane was $32.80, item 3 (h) in finding 48.
57. The defendant made no division or allocation of its costs as between the amount necessary for completing the contract work and the cost of additional changes as required by paragraph 29 of the specification. A substantial part of the cost constituted adjustments made necessary by the installation of lubrite bearings.
Since the actual cost incurred, including rental charges for the use of Government-owned cranes, was in excess of the backcharge of $13,322 for this work, it is reasonable to assume that in computing the estimated cost of completing the contract work some consideration and allowance was made by the contracting officer for overtime premium on *440 labor and costs of changes and maintenance. Although, certain of the items which appear to be included in the back-charge of $13,322 are not properly chargeable to plaintiff, as indicated in findings 48-56, it is concluded from the record as a whole that the backcharge of $13,322 for completion of the contract work by defendant was reasonable.
58. No information was furnished by the defendant in support of items e to n of backcharges set forth in finding 4T herein. No details or breakdown was furnished the plaintiff at the time such backcharges were made. Mr. Kobert B. Burke, who prepared the estimates for the board on changes, and the contracting officer, obtained his information for labor and materials from the Navy Yard maintenance men, with the exception of the estimated cost of replacing a broken gauge. The yard maintenance men gave no testimony in respect of these items.
Mr. Burke obtained his estimate for the replacement of one broken gauge (item k) from a local distributor. The gauge itself was not broken. Only the glass disc cover, about 4 inches in diameter, was broken. The cost of its replacement would be approximately $2. It was broken after the plaintiff’s work was terminated, and is not a proper item for backcharge.
Items 1 and m for additional tools and parts were not backcharged by the contracting officer as the plaintiff furnished additional tools at a cost of approximately $50.
59. Item e. The contracting officer backcharged the plaintiff $1,773 as an estimated cost of installing bronze bushings on the jib hinge pins in lieu of steel bushings. The specifications provide in part:
2-05.4 Bearings.—
(a) Bronze-bushed bearings. — The projected areas of bronze bushings shall be such that the load in pounds per square inch multiplied by the square root of the rubbing velocity in feet per second will not exceed 900. The maximum allowable bearing pressure in any case shall not exceed 800 pounds per square inch of projected area, except that jib hinge bearings may have a maximum of 2,500 pounds per square inch and sheave pin bearings may have a maximum of 1,000 pounds per square inch.
*441 The plaintiff installed steel bushings with provision for lubrication on the hinge pin of the boom because it calculated the bearing pressure would probably exceed 3,000 pounds per square inch, and would cause a bronze bearing to mushroom out and disintegrate.
The design of the boom on drawing 1-A with details of the jib hinge shows a steel pin 4 inches in diameter with 1-inch steel bushings to be provided by the American Bridge Company. These provisions were continued in each revision of the drawing and as it was finally approved September 8, 1942.
The defendant’s project engineer did not consider whether a bronze bushing would have sufficient strength. The jib hinge with steel bushings caused no trouble. The steel bushings were not replaced with bronze bushings. The back-charge was the estimated theoretical cost of dismounting the boom and replacing the bushings. This item was omitted entirely from the defendant’s proposed backcharges in the present claim.
60. Item, f. The contracting officer backcharged the plaintiff an estimated cost of $1,718 to develop and install mechanical ratchet locks on the boom hoists of both cranes.
The specifications provide in part:
2-05.3 (b) Luffing mechanisms shall be arranged so that the position of the jibs can change only when the mechanism is in operation. The mechanisms shall be capable of luffing the loaded jobs [jibs] between the specified radii in the time specified and shall each consist of a motor, flexible coupling, reduction gear unit, drum gear and pinion, drum, automatic electric brake, and mechanical brake, all mounted on a common bedplate. The jibs shall be capable of being lowered to a horizontal position.
2-09. Mechanical brakes, locking devices, radius indicator, and fire extinguisher. — Mechanical brakes of the hydraulically operated type shall be provided for the hoisting and luffing mechanisms. * * *
The plaintiff’s drawing M-ll was designed after the foregoing specifications. A hydraulically operated brake was installed on the hoist and the luffing mechanisms. The plaintiff also provided an automatic electric brake on the shaft of the motor. The jib was under the control of the motor at *442 all times while in operation and could be lowered to the ground. The brake could not be disengaged except electrically. No ratchet locking device was provided on the plan nor installed by the plaintiff.
The first notice that a ratchet locking device would be required was about February 15, 1943, when the cranes were substantially completed. The plaintiff offered to provide it as an extra item.
After the plaintiff was backcharged for this item, it prepared a design and obtained a quotation from the New York Engineering Corporation of $200 for the fabrication of a ratchet, pawl and operating mechanisms for each crane, or a total cost of $400. The reasonable cost of installations on both cranes would not exceed $400, and the total cost would be $800. The item represents a change in the contract requirements and is not a proper backcharge to plaintiff.
61. Item g. The plaintiff was backcharged $1,607 as the «estimated cost of installing dual pronged swivel hooks for the main hoist of both cranes in lieu of the plain single prong hook provided.
The type of hook was not specified. The plaintiff designed a single prong plain hook upon its drawing No. 8 which was submitted for approval January 20,1942. This drawing was ultimately approved without change in respect to the hook.
On May 8, 1942, the plaintiff wrote the defendant and stated :
We are ordering two 30-ton capacity hooks to be attached to the blocks of the main hoist and two 10-ton hooks for the auxiliary hoist, for the two 20-ton whirler cranes for Philadelphia.
We understand our contract calls for plain hooks. Please advise promptly if we are correct in this.
By letter of May 13,1942, the plaintiff received the following reply from J. C. Tily, by direction of Chief of Bureau:
t In reply to your letter, reference (a), the Bureau advises that single-barbed hooks will be required for the blocks of the main and auxiliary hoists for the subject cranes.
By letter of February 15,1943, the public works officer advised the plaintiff in part:
*443 2. In order to get full use of the main hoist, it will be necessary to supply double barbed hooks of the anti-friction bearing swivel type in place of the rigid single hooks now supplied. The swivel hooks are desired as soon as possible. In accordance with verbal conversation with Mr. Jacoby, of your organization, arrangements have been made to have these manufactured in the yard and charged to your Special Deposit Account.
The plaintiff declined to accept any responsibility for the cost of changing these hooks, and the defendant was so advised by letter of February 16,1943.
A yard maintenance order was entered for the replacement of the main hoist blocks May 10, 1943, and noted as completed October 26, 1943. The original hooks installed by the plaintiff were used in the interim. The defendant furnished no cost information for this change.
The actual cost of a double-barbed, swivel type, hook of 85,000 pounds capacity would be $150. The installation merely required that the cable be reefed through the block. The cost of changing the hook assembly would not exceed $50 for each crane. The total cost of changing the hooks to double-barbed swivel type on both cranes would be approximately $400. This represents a change in the contract requirements and is not a proper backcharge to the plaintiff.
62. Item h. The plaintiff was backcharged $1,277 as the estimated cost of installing lubrite thrust washers in lieu of plain bronze washers provided at the hubs of the roller cage wheels. These were not bearings in the sense of carrying a load weight, but merely spacers between the hubs of the wheels and the cheek plates of the roller cage. Lubrite bushed bearings were provided in the wheels of the roller racer under a change directed by the defendant.
The plaintiff had provided for lubrication of the bronze washers in its drawing M-13, to avoid wear by friction upon the washers between the turning wheel hubs and the rigid cheek plates. The oil fittings were deleted by the defendant. The defendant wanted to avoid the use of any oil to test the results obtained by the use of lubrite bearings. The theory of lubrite lubrication was that the antifriction pow *444 der of the lubrite bearings would be deposited upon the pins on which the wheels turned and would be carried out to the side or hub area for adequate lubrication of the thrust washers.
Lubrite washers were not specified or required in the change from plain bronze bushings to lubrite bushings. The defendant never installed lubrite washers. The backcharge is an estimate of what it would cost.
The lubrite bushings did not serve the purpose intended. They did not adequately provide antifriction for the bronze thrust washers. When the roller wheels would turn, the dry surfaces of the hubs and cheek plates would machine away the thickness of the bronze thrust washers. The washers would freeze or stick by overheating, either to the hub of the wheel or the cheek plate, which would increase the wear upon them.
The first measure taken by the defendant to prevent wearing of the bronze thrust washers was to drill the roller pins for lubrication. This did not prove satisfactory, and oil was poured over the washers to provide some lubrication. These were temporary measures to keep the cranes in operation until the work load abated in the yard and materials could be more readily obtained. The cost of this work is now asserted as item 3 of the defendant’s counterclaim.
On or about September 7, 1943, the defendant issued a yard order for the renewal of the roller cage and bolts, and for machining the hubs of the roller race. The defendant contends that this work was necessary because the pins on which the wheels rotate were not in true alignment, causing the hubs and cheek plates to wear excessively and the washers to disintegrate. The pins were set in the line bored casting of the roller frame.
The entire roller race was fabricated by the plaintiff’s subcontractor, New York Engineering Corporation. It was shop tested on tracks similar to those installed on the cranes. The pins were machined and polished smooth. The roller cage was installed on tracks in the cranes 25 feet in diameter* and bolted in place with one-inch bolts.
*445 Under defendant’s direction the Dry Dock Associates installed %-inch bolts in place of the one-inch bolts originally employed by the plaintiff for the purpose of loosening the roller frame (finding 54). The failure of the lubrite bushings to properly lubricate the roller pins, or to provide any lubrication for the hub area, caused excessive wear on the hub and cheek plates and disintegration of the washers. This further loosened the roller wheels. The pins were scarred and pitted by lack of lubrication.
In renovating the roller race the defendant cleaned and polished the roller pins, but they were not replaced. New washers, cheek plates and bushings were installed with a complete lubricating system. The undersized bolts were replaced with one-inch bolts. The cost of this work is now asserted as items 5 and 7 of its counterclaim.
63. Item i. The plaintiff was backcharged an estimated cost of $743 for the installation of guards and track brushes for both cranes. These were required by the contract but not installed by plaintiff. There was no breakdown of this estimate by the defendant. There is no evidence of the time that such work was performed.
64. Item, j. The plaintiff was backcharged $33 as an estimated cost to develop and install an extension to the searchlight handle on both cranes.
The specifications do not designate the length of handle required on the floodlights. The plaintiff provided 3-foot handles. In June 1943, after the Board on Changes had reported ap. estimated cost of $134 for extension handles, the plaintiff purchased and had shipped two 6-foot handles from the General Electric Company, with a request that the 3-foot handles be removed and returned to its subcontractor, the New York Engineering Corporation. The estimated time required for changing the handles was one-half hour on each crane. There is no evidence that the new handles were installed, or that the old handles were ever returned to the plaintiff’s subcontractor. No justifiable backcharge is found.
65. Item n. The plaintiff was backcharged the sum of $55 as the estimated cost of installing guards over the main hoist *446 hook sheaves. The plaintiff contested this item since it was not indicated upon the approved drawings. Addendum 1 of the specifications provides in part:
2-17.1 Safety features. — All exposed gears and other revolving parts shall be provided with suitable and proper guards to prevent contret [contact] with repair men or the operator. Couplings which are not of the safety-flange type shall be provided with guards. All sheaves shall be protected by close-fitting guards to prevent the rope from becoming misplaced or a workman’s fingers being caught between the sheaves and the ropes. All necessary pipe hand rails shall be provided in the machinery houses.
There is no evidence of the time that guards were installed or the cost thereof. The plaintiff submitted no breakdown of its estimate for the fabrication and installation of such guards. The defendant’s backcharge appears to be reasonable.
66. The plaintiff’s total cost of the fabrication and erection of the two cranes involved herein was $299,077.99, exclusive of any salary allowance to the plaintiff’s officers and general partners of the Wagner Company.
The last payment by the defendant to the plaintiff was on March 13, 1943. The total payment to the plaintiff on its contract was $248,378.31.
67. Plaintiff’s contract price was $265,000. The following additions were furnished upon order by the defendant:
Substitution of grooved drums in lieu of smooth drums for the main, luffing, and auxiliary hoist cables (finding 15)_$10,306.65
Substitution of lubrite bushings for plain bronze bushings in all high pressure areas (finding 16)_ 2,885.48
Substitution of spur gear assemblies for gear reduction units (finding 21)_ 2,109.48
Substitution of 175-lb. rails and flanges for conical rollers and roller path (finding 24)_ 3,844.46
Additional l-inch cables for main hoists (finding 28)_ 825.61
Premium payments for overtime labor (finding 31)_ 4,993.20
Total additions to original contract_ 24,964.88
The following items of contract work were deletions from the contract price:
*447 For completing the erection of the cranes (finding 57)_$13, 322. 00
For the installation of guards and track brushes on the trucks of the cranes (finding 63)_ 743.00
For the installation of guards oyer the main hook sheaves (finding 65)__ 55.00
Total deductions from original contract_ 14,120.00
The net increase in plaintiff’s contract price was $10,844.88, thus fixing the contract price as $275,844.88. Plaintiff has been paid $248,378.31 on the contract, leaving a balance due it of $27,466.57.
Counterclaim — Costs of correcting defective work
68. The contract specifications provided in part:
1-13. Warranties by contact (sic) bond. — The contractor warrants the cranes to be free from defects of design, material, and workmanship for a period of one year from date of acceptance of the contract work; and he shall, upon notice, promptly make good at his expense all defects developed during this period. These warranties are covered by the contract bond; they shall not, however, operate to defer final payment for the period ■specified.
2-21. Tests. — Upon completion of the installation, each crane shall be subjected to tests to determine its compliance with the contract requirements, including a test for all motions with a 25 percent over-load on the main hoist hook. The Government will furnish weight slings, and fuel for the tests. Upon completion of the tests, the contractor shall remedy all defects at his expense.
By letter of October 23, 1943, the public works officer advised the plaintiff in part:
1. Some of the items of workmanship and material on Crane No. AL-109 furnished under the subject contract have been defective. It has been necessary for the Yard forces to correct the deficiencies. The items corrected are as follows:
(a) 60 loose fit bolts in the center pin assembly worked loose allowing the center pin assembly to shift off center. This necessitated drilling and reaming the bolt holes .and replacing the bolts furnished with 60 114-inch •body-bound bolts. Estimated cost, $250.
*448 (b) The fuel oil tank in the rear of the machinery-house developed leaks. It was necessary to remove the tank, clean, repair and reinstall. Estimated cost, $60.
(c) It was impossible to keep the upper gears of the tracking unit properly lubricated. To permit proper lubrication, it was necessary to install grease pans on the gears. Estimated cost, $100.
(d) The teeth on the main rotating gear were found to be at uneven heights, and in some cases interfered with the roots of the pinion. This necessitated grinding off the uneven heights of the teeth to a standard gauge. Estimated cost, $75.
The plaintiff was requested to forward $485 to cover the cost of the above work under its warranty bond.
The defendant’s inspection report for April 12, 1948, contains the following entries:
Final tests scheduled for today.
While waiting for delivery of weights crane No. 109 ran through an open switch, splitting diagonal beams on north legs.
There is no evidence of any corrective measures taken by the defendant to repair damages resulting from this incident, other than welded diagonal members observed by the plaintiff’s representatives about February 1, 1944.
69. On January 25,1944, the assistant public works officer wrote the plaintiff, again requesting the reimbursement of $485. This letter also stated in part:
2. On 8 Nov. 1943, the BuY&D was informed of the failure of “Lubrite” bearings and the structural defects that had become apparent in the steel members for the portal frames. Photographs showing the failure of structural members have been taken. It is considered by this office that the evidence is substantial and predicates necessary repairs by the manufacturer under the Performance Bond of the Contract. It is requested that you have a representative visit this office as soon as possible in order to make an inspection of the structural defects so that arrangements can be made to accomplish necessary repairs.
On February 1, 1944, the plaintiff’s representatives, Charles Goodman, Bobert Goodman, and S. M. Eodd, the plaintiff’s designer at that time, went to the Philadelphia Navy Yard. They observed the cranes in operation. Only *449 one of the cranes showed evidence of having its diagonal members welded near the base of one of the portal legs.
The plaintiff’s representatives discussed the cranes with defendant’s officials, but were not advised of any defects in the cranes requiring correction. The foregoing communications were the only instances when the plaintiff was advised ■of any defects in the cranes requiring corrective measures, after the defendant had completed the cranes.
70. The estimated cost of the following items is now ■claimed by the defendant:

There is no documentary evidence in support of the foregoing items, other than a maintenance log for each crane wherein entries appear for most of the items involved. The amounts claimed represent the estimated maximum allowance for performing the work authorized. Separate costs were not kept for these items, but all such work was paid for out of maintenance fund allotments. All estimate sheets and shop orders pertaining to such costs were destroyed.
Yard maintenance and shop men gave testimony in respect to the work necessary to perform the items of work *450 now claimed, but in no case is there sufficient evidence for a reasonable determination of the costs thereof. In no case is there sufficient evidence to conclude the plaintiff was responsible for such corrective work under its contract.
71. Under item 1 of its counterclaim defendant’s estimate of $3,000 is for the renewal of bushings in the boom sheaves. The estimated cost of ratchet and pawl locking devices was-included as item (f) of backcharges set forth in finding 47.
Sheaves were the grooved wheels which carry the wire-cables between the hoist drums and the load hook. They were designed to turn upon a rigid axle or pin, and were-provided with lubrite bushings for lubrication. The lubrite-powder became deposited upon the sheave pins and acted as-a binder rather than a lubricant, and the wheels would not turn. The defendant contends that this condition resulted from the failure of the plaintiff to properly machine and polish the pins. A similar binding condition was experienced in all areas where the lubrite bearings were installed.. All bearing pins were fabricated by the New York Engineering Corporation by machinists of long experience. They were machined and polished to a smooth finish.
The work involved the removal of all lubrite bushings,, which were discarded. New bushings were installed of composition “H” bronze, with provision for lubrication. The-failure of the sheaves to function properly resulted from* the employment of lubrite bearings, and not from any fault' or negligence in their fabrication or installation.
The replacement of the lubrite bushings in the luff sheaves' under item 2 of defendant’s counterclaim became necessary for similar reasons.
- 72. Item 3 of the defendant’s counterclaim covers three-classes of work. Floor plates on the gantry corners were not shown in the plans of construction nor contained in the specification. They were obviously placed to facilitate-the work of maintenance forces on the roller race and the-boom. The drilling of the roller pins for lubrication was-a temporary measure to keep the cranes in use, because the lubrite bearings failed to provide adequate lubrication. The plaintiff had provided for lubrication of the hub washers on its drawing M-13, but this was deleted by the defend *451 ant, on the theory that the lubrite bushings would provide adequate lubrication.
The installation of new bearings in item 3 is also contained' in item 5 of defendant’s counterclaim. The work required on the roller race and the changing of bolts in the roller race- and king pin assembly became necessary because of the employment of lubrite bushings in the wheel bearings, the deletion of any provision for lubrication for the thrust washers,, and the installation of undersized bolts by the Dry Dock Associates under the defendant’s direction. Items 3, 5, and 7 of defendant’s counterclaim are covered in finding 62, and need no further findings here.
The defendant claimed $1,500 for bolts supporting the-center pin under item 7 of its counterclaim. This represented its estimate for the installation of about 60 bolts 1 inch in diameter, and 4 inches long. By letter of October 22,.’ 1943, the defendant advised the plaintiff of additional back-charges of $485, including an estimated cost of installing 60-loose bolts in the center pin assembly for $250. The defendant’s estimate of $1,500 represents the theoretical cost of the-work, if done separately, although it was actually performed in connection with item 5. The plaintiff estimated the cost of renewing these bolts at $142. The Dry Dock Associates-had replaced the original 1-inch bolts installed by the plaintiff with %-inch bolts, at labor costs of $151.93 (finding 48).
73. Item 4 of the defendant’s counterclaim also consists of three items of work, none of which resulted from the required performance of the contract work. The installation of hand rails on the booms of the cranes was to avoid hazards and to-aid in the lubrication of the sheaves.
The reinforcement of the hook assembly consisted of adding plates to the load block for sufficient weight to carry the hook assembly to the ground when the brake was released. The lubrite bearings became frozen to the sheave pins and would not turn freely. This was one of the uncompleted items of work on crane AL-109 at March 30,1943, estimated at $200, item (o) of finding 48 (par. 3 of finding 56).
The leakage of the oil tank resulted from the surging of' the oil inside, which was caused by the jerky motion of the-crane in travel. The defendant contends that surge plates. *452 should have been provided. This item also related to crane AL-109, which became damaged when it ran through an open switch on April 12, 1943. There is no evidence that the leaky tank resulted from defective manufacture.
74. Under item 6 the defendant claims $200 for the installation of sand boxes previously furnished by the plaintiff. This equipment was specified and the plaintiff had placed an ■order for fabrication during the early period of the contract.
In April 1942, the defendant verbally directed the plaintiff to omit sand boxes. The supplier had the work in process and declined to cancel the plaintiff’s order. They were purchased from the Linton Corporation, of Berea, •Ohio, at a cost of $1,100. The sand boxes were delivered to the Navy Yard and placed in its warehouse, upon the •direction of defendant’s officers. The plaintiff was told not to install them.
The cost of installing the sand boxes should have been included in the completion costs performed under the defendant’s direction, and was so included in this report (finding 67). No further amount is found here.
75. Items 8,10,16, and 17 of defendant’s counterclaim all relate to the structural steel portal legs and braces of the •cranes. The maintenance log for the cranes indicates that the work performed on crane AL-109 was completed in July 1944, and that for AL-110 was completed in March 1945. Item 16 relates to crane AL-110 only, whereas item 17 relates to crane AL-109 only.
A separate item was included in the defendant’s counterclaim for the reinforcing of the portal structure of crane AL-110 in 1949, at a cost of $1,862.52. This work was necessary to remedy damages resulting when the crane ran through an open switch. This item was withdrawn by the defendant.
The defendant alleges that the diagonal members of the structural steel frame were not properly fitted, and that shims were employed in the bolted connections of the diagonal 'braces with the portal legs. The prime cause of the failure •of the structural steel frame was the failure of the lubrite bearings on the top of the four trucks that carried the superstructure. Each of the portal legs of the crane was con *453 nected with a truck by a heavy rigid gudgeon pin. The-gudgeon post, which was designed to slide freely upon the pin, was provided with lubrite bearings for lubrication. No lubrication was afforded by the lubrite, and the gudgeon post housing became frozen to the pin, causing the crane to travel in a jerky motion. The entire crane would weave when starting in motion and in negotiating curves, which set up high stresses throughout the structural members. It threw the legs out of alignment and resulted in a spread of about 1y2 inches off gauge from the original design.
Crane AL-109 ran through an open switch on April 12,. 1943, splitting the diagonal steel members connecting the portal legs on one side. The only work performed to correct this damage was evidenced by some welding of these braces.
The evidence is conclusive that the failure of the structural steel portal frames resulted largely from the improper operation of the trucks. The cranes were in use for more than a year on an emergency shipbuilding program before this work was performed. There is insufficient evidence to attribute any part of this failure to the fabrication and erection of the structural steel.
76. Items 11 and 13 of defendant’s counterclaim relate to work required in removing and replacing bearings in the crane trucks, and item 15 is for new bolts replaced in the-trucks which had become distorted. The defendant contends that this work became necessary by reason of misalignment of the bearings. The work consisted largely of the removal of bearings, both in the truck wheels as well as in the connections with the superstructure. They were replaced by heavier plain bronze bearings with provision for lubrication.
The trucks were ordered from the plaintiff’s shop before they were tested and finally completed. The plaintiff performed a substantial amount of additional work on the trucks at the erection site (findings 33, 34, and 35). After the plaintiff’s contract work was terminated, considerable work was performed by the defendant upon the machinery, the gudgeon pins and journal boxes. The cost of this work was backcharged to the plaintiff (finding 55).
The journal bearings and gudgeon pins became scarred and mutilated from continuous use and lack of lubrication. *454 Tbe only reasonable conclusion is found to be tbat the lubrite bearings ordered by the defendant and installed by the plaintiff did not afford proper lubrication. The cranes were in use at the Navy Yard for more than a year before this work was performed on crane AD-109, and approximately 2 years before such work was completed on Crane AL-110. It is here found that no part of the cost of these items is attributable to the plaintiff.
77. Under item 9 of the counterclaim the defendant claims $500 for the remachining of the bearing pedestal and renewal of the bearings for the auxiliary hoist in crane AD-110. The defendant contended that the auxiliary hoist was out of •alignment and the bearings were completely worn out. This ■caused the cable to follow improperly the grooves of the •drum. The defendant contends that the renewal of the bearings necessitated the removal of the auxiliary hoist drum through the roof of the machinery house.
The pedestal, which contains the bearings carrying the auxiliary hoist drum, is bolted upon the stationary platform -of the crane. The pedestal pin turns the drum, similar to a suspended wheel. The pedestal could be unbolted and removed without removing the entire hoist.
The original cost of these bearings was $33.25 each. A reasonable cost of installing new bearings for one crane would be $134.75. These bearings were furnished by the New York Engineering Corporation, and were shop tested ■and in proper alignment before shipment.
The removal of these bearings was completed about December 12, 1943. It was not attributable to faulty fabrication. These were plain bronze bearings which required lubrication. The failure to lubricate the bearings would cause them to wear out within the period of seven months’ use prior to November 13, 1943. It must be concluded that this work was necessary maintenance, and not the responsibility •of the plaintiff.
78. Item 14 of defendant’s counterclaim for $600 is asserted upon the theory that additional shoring would be required to perform the work listed under item 9. There is no evidence that the additional shoring was actually necessary, or that the auxiliary hoist was hoisted through the machinery *455 house, as alleged. The original shoring became necessary to support the crane when the trucks were removed for the renewal of their bearings and other work, claimed under items 11,13 and 15. This work was not completed for crane Alb-110 until March 1945, long after the renewal of the pedestal hearings.
There is no basis, in fact, for this charge.
79. Under item 12 of its counterclaim, the defendant claims •estimated cost of $150 for grinding off uneven teeth of the main rotating gear. It is alleged that the tops of the prongs •on one gear would strike the bottom groove of its mated gear ■causing a bumping noise.
This gear was furnished by the New York Engineering ■Corporation. It was fabricated by a regular gear cutting concern. The usual tolerance was found in the gears furnished. The tops of one gear never touch the bottoms of the opposite gear. The drive contact is approximately midway •of the gear teeth,' and small differences in the length of the •corresponding teeth would not affect the rotation or meshing •of the gear.
The maintenance log kept for each crane contained entries for all work performed on these cranes during the period involved herein. No entry appears for the grinding of the •main rotating gear as claimed here.
80. Defendant has withdrawn items 14,15,16, and 17 of its ■counterclaim. No reasonable basis can be found for any .amount of the defendant’s counterclaim. The contract changes performed by the plaintiff upon defendant’s direction and approved plans, less all offsets for contract changes and completing the erection of the cranes by the defendant, resulted in net increased costs to the plaintiff in the sum of $27,466.57 above the payments to it (finding 67).
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States the sum of twenty-seven thousand four hundred sixty-six dollars and fifty-seven cents ($27,466.57).
*456 The court further concludes that as a matter of law defendant is not entitled to recover on its counterclaim, and the counterclaim is therefore dismissed.